**E. Paul BLACK, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 16983.**

United States Court of Appeals
Eighth Circuit.

Oct. 30, 1962.

Rehearing Denied Nov. 21, 1962.

Don Russell, St. Louis, Mo., for appellant; Tyree C. Derrick, St. Louis, Mo., on the brief.

John A. Newton, Asst. U. S. Atty., St. Louis, Mo., for appellee; D. Jeff Lance, U. S. Atty., St. Louis, Mo., on the brief.

Before SANBORN and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

REGISTER, District Judge.

The appellant, E. Paul Black, was charged in a three count indictment with attempting to evade and defeat income tax due and owing by him and his wife to the United States of America for the calendar years 1954 (Count I), 1955 (Count II), and 1956 (Count III), by filing false and fraudulent joint income tax returns, all in violation of Section 7201, Title 26, U.S.C. The sums involved in this litigation, as set out in the appellant's tax returns and the indictment, are as follows:

|  | Amounts Reported in Tax Returns | | Amounts Alleged in Indictment | |
|---|---|---|---|---|
|  | Income | Tax Thereon | Income | Tax Thereon |
| Count I .....(1954) | 12,780.66 | 3,062.20 | 29,431.19 | 9,294.90 |
| Count II .....(1955) | 20,880.65 | 5,740.65 | 42,999.21 | 16,266.90 |
| Count III .....(1956) | 12,428.08 | 2,974.42 | 17,917.70 | 4,659.91 |

---

Following a trial by jury, appellant was found guilty on all three counts and sentenced to confinement for a period of thirty months on each of the three Counts, said periods of confinement to run concurrently, and in addition thereto fined a total of $5,000.00. Appellant's appeal to this Court is from that verdict and sentence.

The first error assigned is that "The Court erred in failing to sustain defendant's motion for a judgment of acquittal filed both at the close of the government's case and at the close of the entire case because there is no evidence that the defendant knowingly and willingly (sic) attempted to evade paying the taxes due the United States". Because appellant has challenged the sufficiency of the evidence to support the verdict of guilty, we have carefully examined and considered the entire record, including

the original transcript of the evidence. The following principles apply:

"1. In determining the sufficiency of the evidence to support the verdict of the jury, this Court must take that view of the evidence which is most favorable to the government, and give to the government the benefit of all inferences which reasonably may be drawn in its favor. Affronti v. United States, 8 Cir., 145 F. 2d 3, 5, and cases cited.

"2. The burden of demonstrating prejudicial error is upon the appellant. Marin v. Ellis, 8 Cir., 15 F.2d 321, 322; Metropolitan Life Insurance Co. v. Armstrong, 8 Cir., 85 F.2d 187, 195; Kimball Laundry Co. v. United States, 8 Cir., 166 F.2d 856, 859." Myres v. United States, 8 Cir., 174 F.2d 329, 332.

"We must assume that all conflicts in the evidence have been resolved in favor of the government and the government as the prevailing party is entitled to the benefit of all such favorable inferences as may reasonably be drawn from the facts proven." Hoyer v. United States, 8 Cir., 223 F.2d 134, 139.

The indictment was returned on March 29, 1961. On May 23, 1961, the government filed a bill of particulars, in which it was stated:

"1. All three counts of the indictment are based on the omission of specific items of income from the Defendant's tax returns and the taking of improper deductions on those returns.

"2. The omitted income is of the following kinds.

"a. Gains from Mutual Funds. Income omitted in all years.

"b. Gains on sale of lots. Income omitted in all years.

"c. Unreported business receipts from hauling and excavating work. Income omitted in 1955 and 1956.

"d. Unreported interest income. Income omitted in 1956.

"3. The improper deductions consist of fictional payments for rent and equipment."

Section 7201 of 26 U.S.C. provides that "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall * * * be guilty of a felony and, upon conviction thereof, shall be * * * *" punished as provided by law.

During the years with which we are here concerned, Black owned a business in Flat River, Missouri, which consisted in large part of performing a contract with the St. Joseph Lead Company to transport chat from its mine dumps to the mills of the Company for reprocessing. In addition thereto, appellant engaged in excavating work, land clearing, bulldozing and miscellaneous hauling and work of a similar nature. In order to perform his contract with the St. Joseph Lead Company, trucks and drivers were required. Black rented a number of trucks and employed drivers to operate them. In any one twenty-four hour period approximately 20 to 25 trucks and 40 to 45 drivers were used in this operation. Truck rental and driver's wages were based upon tonnage hauled. A daily record of the number of tons of chat hauled by each truck and driver was kept by the Company. During 1953 and until April, 1954, such tonnage report was given weekly by the Company to James Crites, an employee of Black at the latter's headquarters near Desloge, Missouri. Each week Crites computed, from the tonnage reports, the rental due each truck owner and the wages due each driver, made out the checks accordingly, and delivered them to Black, who signed them and delivered them to the payees.

During 1953 and 1954 Black also employed an independent accountant, Wynne Edmonds, whose offices were in Flat River, Missouri. The business records and books of Black were maintained by Edmonds in the latter's office. Crites delivered the tonnage reports and payroll records, together with the truck rental payment record, to Edmonds' office each week. Information from these records was then entered on an employee earning

and history record, and the total of the payroll, and allocation, was entered in a journal. During the time Crites was employed by Black, Edmonds had nothing to do with computing the payroll.

Crites terminated his employment with Black in April, 1954. Prior to that time, Crites, Black and Mary Ann Boyer, an employee of Edmonds, conferred in Edmonds' office, at which time Black requested Mrs. Boyer to perform the services previously done by Crites—that is, accept the tonnage reports, compute the weekly payroll therefrom, and draw the checks for signature and distribution by Black. At this meeting Mrs. Boyer was instructed in the proper procedure in computing payments for truck rental and wages. Thereafter Mrs. Boyer did perform such service until she left Edmonds' employ.

At the end of each month a profit and loss statement was prepared, as was a balance sheet (in duplicate) that reflected the assets and liabilities and the cumulative total of profit and loss for the year. The information necessary for the preparation of these statements was taken from the journal and ledger in which had been entered all payroll information, including truck rental payments. A duplicate copy of the balance sheet was given to Black.

Initial information as to disbursements made by Black was secured by Edmonds from check stubs. Each month Black delivered the stubs from his personal checkbook to Edmonds in order that he have the necessary information for book entries. The stubs of checks issued for the payroll remained in Edmonds' office. Information as to income came from the bank deposit records and the statements from St. Joseph Lead Company. From time to time Black gave to Edmonds information, orally, as to items of miscellaneous income. All such information as to income and disbursements was entered in a journal and ledger, and the tax returns for the years here involved were prepared from these records.

Prior to April, 1954, when his office "took over" the preparation of the payroll, Edmonds received fifty dollars per month for his services to Black; subsequent to the stated date, Edmonds received ninety dollars per month.

In 1953 Black owned three of the trucks which were used in performing the contract with St. Joseph Lead Company. As driver for one of these three trucks, Black had in his employ a Raymond C. Russell. At that time (in 1953) Black approached Russell at the chat fields, and asked Russell if he would "run" these three trucks in his name, and each week when he (Russell) would receive the check for rental therefor, he would endorse the same and deliver it to Black. Russell agreed. Thereafter, each month until the termination of Russell's employment in January, 1956, this arrangement was carried out, although Russell never took title to the trucks, never paid the registration fees thereon, and never received any part of the rental proceeds therefor. Immediately after making the described arrangement with Russell, Black directed Crites to issue the rental checks for the three trucks to Russell, and Crites complied. Other persons subsequently charged with the preparation of the payroll continued such practice. The permanent business records maintained by Edmonds, based in part upon the tonnage reports and payroll records, reflected the payment of truck rental for the three trucks as having been continuously made to Russell, during said time.

During all of the time such truck rental payments were being made to Russell, Black maintained a business checking account in each of two local banks. The truck rental checks made out to Russell, endorsed by him and handed back to Black, were not deposited in any bank account by Black, but were always cashed. Weekly income to Black from this source averaged $300.00, and continued until January, 1956.

On May 1, 1954, Mr. and Mrs. Black, accompanied by Edmonds, visited an investment broker in Farmington, Mis-

souri. At that time, an investment account was opened in the names of Ernest P. and Mrs. J. Irene Black. Such names were not in the form usually employed by the defendant and his wife. This account, placed with Affiliated Funds of New York and General Industries of Managed Funds, St. Louis, Missouri, was closed on January 9, 1956. Under the investment contract, no dividends were to be paid in cash, but were reinvested. Mr. and Mrs. Black made weekly investments during the life of this account of $300.00 in cash. The broker deposited each weekly payment in a bank in Farmington, and drew checks to the respective funds to purchase the shares. The weekly payments of cash were almost always made by Mrs. Black.

Each quarter Managed Funds, Inc., prepared a voucher or notice which showed the total amount of distribution or amount due the individual shareholder. A copy thereof was mailed to each shareholder. At the close of each year, Managed Funds, Inc., was required to file what is known as Treasury Form No. 1099 with the Commissioner of Internal Revenue. A copy of this form was retained by Managed Funds, Inc., and two copies were mailed to each shareholder. This form showed the total amount of distribution made to each shareholder for the year and was mailed prior to February 28th of every year following the closing of the fiscal year (which was November 30th). Form 1099 for the years 1954, 1955 and 1956 (Plaintiff's Exhibits 22, 23 and 24) from Managed Funds, Inc., to appellant and Mrs. Black, disclosed annual dividends in the amounts of $274.82, $1042.47 and $1786.08, respectively. On each of these 1954 forms was printed:

### "INCOME TAX RETURN REQUIREMENTS

"An income tax return must be filed, on or before March 15, 1955, with the District Director of Internal Revenue for the district in which the payee lives, if the total income reported on this form, when added to his income from all other sources, amounts to $600 or more."

Similar information was printed on such form for each of the other years, which was identical except as to the year during which the return must be filed. Also, Managed Funds, Inc., prepared annually a schedule of gains and losses, showing net dividend income and application of the distributions to dividend income or capital gains. A copy of this was mailed to each shareholder within thirty days after the end of each fiscal year, and in effect reflects the percentage of the dividend received by him that is taxable as ordinary income and the percentage taxable as long-term capital gain. At the top of such printed schedule which is dated December 29, 1954, are the following words, printed in large type: "Taxability of Dividends Paid during 1954", and at the bottom thereof, are the following: *"File this copy with your Federal Income Tax return"*. Attached thereto is an exact duplicate, except as to the instruction, which reads: *"Keep this copy for your records"*. Schedules for 1955 and 1956 are identical, except as to the years referred to, and such schedules are of record as Plaintiff's Exhibits 25, 26 and 27.

On the form of acknowledgement sent by Affiliated Funds, Inc., to the shareholder following each cash deposit was a statement as to tax liability; each time a cash dividend was declared, and each time a capital gains was declared, a report was sent to each stockholder and on this report was a statement as to taxability. Once a year an annual report was made to each stockholder, in which reference was made to taxability. It was stipulated that, under the Affiliated Funds, Inc., contract with Mr. and Mrs. Black the dividends and capital gains were as follows:

| Year | Dividends | Capital Gains |
|------|-----------|---------------|
| 1954 | $ 46.35   | $206.99       |
| 1955 | 316.05    | 608.88        |
| 1956 | 553.32    | 645.79        |

In 1958 and 1959, Mr. Russell James was a Special Agent for the Intelligence Unit of the Internal Revenue Service. It was a part of his duties to conduct investigations as to income tax liabilities. He conducted an investigation into the income tax affairs of Black for the period here involved, which investigation commenced in the spring of 1958 and was concluded in the fall of 1959. He compared the income of the defendant as reflected on the books with the income tax return for each of said years, and the books and returns were in agreement. Truck payment rentals paid to Russell appeared in the disbursement journal where they had been entered originally, and had been carried over into the truck rental column of the journal. The total of such truck rentals shown paid to Russell in 1954 was $13,944.39. This figure had been posted in the truck ledger account, and had been deducted in computing net income, and the 1954 income tax return was in accord with said books. The books disclosed the total truck rental payments to Russell for 1955 as $15,579.55, and the income tax return for 1955 was in accord therewith. The total truck rental payments to Russell for 1956, as disclosed by the books, was $451.81, and this constituted a deduction in the computations appearing on the return for that year. The amount shown on the books as paid to Russell for truck rentals each year constituted a part of the deduction appearing in the return for such year under the classification "Rent of Trucks and Equipment". These figures are not disputed, and Black conceded that they were not proper deductions.

The government contends that Black knew these deductions were not proper at the time of the execution of the respective returns, but that nevertheless he signed each thereof, knowing it was incorrect, and knowing that it understated his income tax. Black contends that he did not know that the amounts received from Russell as alleged truck rental were not entered on the books, as income, and believed they had been, believed they were included in the returns, and that he did not know such returns were incorrect until after the investigation had commenced. He contends that he did not intend to evade any part of his income tax and, hence, that the required element of willfulness is not present.

"Willfulness 'involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income.'" Holland et ux. v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150; Blackwell v. United States, 8 Cir., 1957, 244 F.2d 423, 429.

"The existence of intent, motive or wilfullness is a question of fact which may be proved by direct or circumstantial evidence, and * * * evidence on the question of intent, where that is material, may take a wider range than is allowed in support of other issues, otherwise there would often be no means to disclose the purpose of the act charged in which the very gist of the offense may consist." Hoyer v. United States, supra.

It is undisputed that Edmonds prepared the income tax return for each of the years involved from the business books of defendant, and that, after the same was fully prepared, Black and his wife went to Edmonds' office and signed the same without examining it. The only unusual features of the case are that the amount of the purported truck rentals is not in dispute and concededly was an improper deduction, and the dividends and capital gains from the mutual funds are definite and undisputed in amount and concededly were improperly omitted from the returns. Knowledge and intent of Black constitute the basic fact issue.

Black was born on February 20, 1918, in Elvins, near Flat River, Missouri. He attended a country school for eight years, and the high school in Elvins for two years. He then worked for a time in a restaurant in Farmington, Missouri; thereafter, for a drilling contractor, and then for the St. Joseph Lead Company. While employed by the Lead Company, he worked in the yards, loaded and handled

trucks, and learned to use heavy equipment. He quit this job in 1947 and went into business for himself, beginning with one piece of heavy equipment. Shortly thereafter, he entered into a contract with the Lead Company for transporting chat. As his business expanded from time to time, Black purchased a substantial amount of additional equipment, including shovels, trucks, and a bulldozer. At the time he began his own business, he had no books or bookkeeper, and in the latter part of 1947 or early part of 1948, employed Edmonds to "set up" a set of books for him, and to maintain them. Defendant contends that, due to his limited education, he knew nothing about books or bookkeeping. In his testimony, in response to the question, "Did you ever discuss those books with him at the time they were set up?", Black replied, "No, I never discussed books. I wouldn't know what I was talking about anyway." (Tr. p. 515), and "Q. Now, did you ever at any time with Mr. Edmonds examine your books or look at them or see them?

"A. I never did look at them, and I was never told about them, and I didn't know anything about looking at them when I looked at them, so I was too busy and I didn't look at them, I wouldn't know what to look for." (Tr. p. 530). Edmonds continued to work for Black until 1957. Black contends that during all of this time he relied exclusively upon Edmonds to keep his books and records (except as to the tonnage reports and payroll service performed by Crites during his employment); that he reported all income of every kind to him; that he sought and relied upon his advice on business matters, as he had faith in him and trusted him; that Edmonds assured him that everything was taken care of and the books were correct; and that he and Mrs. Black signed the returns which had been prepared by Edmonds, without personal examination or inspection.

Black testified in effect that while he was performing the contract to transport chat for the St. Joseph Lead Company

he was having labor trouble due to representatives of the Teamsters Union; that he discussed this matter with Edmonds and that they went to the general manager of the Lead Company (a Mr. Murphy) in the early part of 1953; that Mr. Murphy advised him that "it would be a lot better if each man owned their own trucks" (Tr. p. 521), and that on the way home he and Edmonds continued to discuss this matter. Mr. Black testified as follows:

"A. Well, on our way back from Bonne Terre to Desloge, which is about four or four and a half miles, 'Wynne', I told him, I said, 'I don't know what to do, I'm going to have to get rid of those trucks', and he said, 'Well, why not take and just— who's your oldest man?' I said, 'Well, R. C. Russell.' He said, 'Why not take and run them in as if he were owner?'

" 'Well, I don't know, we can see him and find out, see what he thinks.' He said, 'That a way, why, it will kind of ease St. Jo's mind a little', when they looked at the reports, that somebody owned them besides myself.

"Q. Had you been advised or have any knowledge of the organizers of the unions checking at the St. Jo Lead Company to see who the owners——

"A. Yes, I had heard that they could because they—in a small town down there like that, they know pretty well who all owns trucks.

"Q. I see. Now where did you go with Mr. Edmonds, and you?

"A. We came on from Bonne Terre and went on down to Desloge chat field. That's where we were hauling our chat and loading for St. Jo.

"Q. Did you have a conversation with Mr. Russell?

"A. Yes, we stopped him. He happened to be working. I don't know whether it was the day shift or evening shift. Anyway, he was

there, and when we asked him, said, 'R. C., how about running these trucks in your name?'

" 'Well', Raymond said, 'Well, it's okay by me', and——

"Q. Did Mr. Edmonds explain to him there at this meeting in your presence how the payments would be made, and the things of that kind?

"A. Yes, he did.

"Q. Now, will you explain that to the jury, please?

"A. He said, 'There will be two checks made out, one for you as a driver, and one for you, the same as if you owned the truck, although the one that the truck driver, you will endorse it and give it back to Paul', and Raymond said, 'Okay', he would go along and do that, and that's what we done.

"Q. Now, what happened with that money?

"A. Well, Wynne told me, I didn't draw any salary, or anything, he just told me, he said, 'You go ahead and keep that for your living and expenses', so on, like that, 'as a salary.'

"Q. Did you ask him anything about the money with respect to taxes or records or things of that kind?

"A. I told him this, I said, 'That is money that is due me, or due my equipment', and he said, 'Well', he said, 'you don't have to worry about that', he said, 'I know it and I'll put it all on the books, it will all be taken care of.'

"Q. Was anything mentioned about income tax or taxes?

"A. He said it would all be put on your books and charged to you and taken care of in the taxes, so on, like that.

"Q. And from then on, did you have other discussions with him? Was it mentioned any time, casually or otherwise?

"A. Well, yes, We had talked about it, Wynne and I, several times, on several occasions, on this year. I cashed the checks, went ahead about my business, and he told me all the time, he said, 'Well', he said, 'I know all about it, so you ain't got nothing to worry about, I'll take care of it, you just go ahead and do your job.' " (Tr. pp. 522–524)

Mr. Edmonds testified that all of the payroll and truck rental information received in his office was entered on the books to the best of his information, that monthly a profit and loss statement was prepared and discussed with Black, and that, in analyzing the profit and loss statement, the truck rentals and the payroll were discussed. Edmonds also testified that in January, 1955, he prepared Internal Revenue Service Form "W–2's" (statement of earnings and taxes withheld for each employee), and Form 1099 for each truck owner, and one evening during the latter part of January, 1955, at his office, discussed the same in detail as to rental of each truck and wages of each driver with Black; that the information contained on said Forms was taken from the books, and that a similar conversation occurred in January, 1956, and January, 1957, as to the previous year. The testimony of Mr. Russell concerning the truck rental arrangement was that he was approached by Mr. Black, who was then alone, and that Mr. Black personally requested that this arrangement be made and instructed him concerning the same. Mr. Crites testified that he began writing the truck rental checks to Mr. Russell in 1953, on a weekly basis, in accordance with directions from Mr. Black, personally, and that no reason therefor was stated. It will be recalled that this was long before Edmonds had anything to do with the tonnage reports and payrolls, and that, when Mr. Crites terminated his employment and this work was performed by Edmonds' office, Mrs. Boyer was personally instructed by Black and Crites concerning the method of handling the tonnage reports and payroll.

The testimony of Black and Edmonds is also squarely in conflict as to the omission from the returns of the dividends and capital gains from the mutual funds. Mr. Black testified in part as follows:

"Q. I see. Now, Mr. Black, was there ever any discussions with respect to the interest or things that you got from this Fund with Mr. Edmonds?

"A. Oh, yes, in our home.

"Q. Would you tell what occurred?

"A. Well, he would come—he would come to our office and say, 'Well, how's Funds making it?' My wife would save any notice, anything that she got through the mail, she would save it and Wynne would go through there, Mr. Edmonds go through there and look through all of them, and he would say, 'Well, looks like they're doing pretty good.' He would figure up and tell us how much they were growing, and—but he said, 'You'ins don't have to pay any tax on any of this here until you cash the money in, because you're not receiving any money', and that was his contention all the way through.

"Q. Did you have more than one discussion with him with respect to these slips?

"A. Oh, yes, many times. He told us not to worry about it, that we just didn't have to do it, until we receive money from our investment.

"Q. Did you ever at any time tell him that you—not to report that on your tax return?

"A. No, I never did at any time tell him not to report anything on my taxes. I left it all entirely up to him, because, because me not being a bookkeeper, knowing anything about books, I just left everything up to him, whatever he had on there, that's what I was sure was right." (Tr. pp. 539–541)

A part of Mrs. Black's testimony was:

"Q. Did you ever get any little white pieces of paper from the Funds, this deposit that you made?

"A. Yes, I have gotten tax—it said something pertaining to tax, that I would save every letter, anything that we had. I would save it and I would ask Mr. Edmonds and I know of two distinct times, I don't have the dates but—I don't remember dates, but it's the truth, that he threw them into the wastebasket, and I would pick them up and save them, and I would keep hounding him and hounding him and he would say, "It's all on the books, it's all right', he said, 'you don't have to pay on those dividends, or any money that you invest or anything like that.'

"He says, 'You don't have to pay on it until you draw it out.' He said, 'If it's twenty years from now.' That's the impression that he always left with Paul and I." (Tr. pp. 593–594).

Edmonds testified that he and Black had a meeting in December, 1954, concerning all 1954 reportable income, and that, at said meeting, "I said the dividend and capital gains from mutual funds was taxable income, and that it must be reported."

"Q. What, if anything, did Mr. Black state?

"A. He wasn't going to report it."

Edmonds also testified that he and Black had a conference at the former's office the latter part of March, 1955, concerning the return for 1954, and that at such meeting:

"I said, 'Mr. Black, is there any other income that you might have had that is not reflected on the books?'. Mr. Black says, 'There is no other income.'

"I said, 'I know that you have dividend income from mutual funds and that should be reported as taxable income.'

"Mr. Black said that he was not going to report it."

(Tr. p. 76) Edmonds testified that a substantially similar conversation took place at a conference in Edmonds' office with Black in March, 1956, as to 1955 income, and in March, 1957, as to 1956 income, and that at each of such conferences he and Black only were present. Edmonds also testified that the Form 1099s were always sent to Black, who received them, and were never turned over to him (Edmonds).

█ It is axiomatic that the credibility of the witnesses and the weight to be given to the testimony of each thereof rests within the sound discretion of the jury. The explanation of Black whereby he sought to demonstrate his good faith and honesty in his dealings with the government was sharply contradicted by the testimony of Edmonds, which, if believed, established knowledge on the part of Black of the falsity of the respective returns, when made, and from which the intent to evade income tax could be reasonably deduced.

In this case there was proof of many circumstances which were relevant to the primary issue of knowledge and intent. The investment with the mutual funds began in May, 1954. The amount of the weekly payments was $300.00, which coincided with the amount of the fictitious weekly truck rentals. The checks for such rentals were always cashed, and the payments on account of the mutual funds were in cash. Mr. Russell terminated his employment in January, 1956, and the last payment into the mutual funds account was also in January, 1956. The arrangement which had existed with Mr. Russell was not continued with any other driver. This fact Mr. Black explained by stating that the labor trouble that had given rise to such arrangement had then ceased, and "I wanted to get a crushing plant and we needed all the money we could get together, to help—you know, pay down, and kind of get started out in that." (Tr. p. 539). This testimony was inconsistent with the undisputed evidence (admitted by defendant) that in January, 1956, he and Mrs. Black had taken a vacation trip to Stockton, California, to visit relatives, and that, on this trip Black had deposited a total of $10,000 in cash in two savings and loan accounts in Stockton— one for $5,000.00 with the State Savings & Loan Association of said city, and the other for $5,000.00 with the Stockton Land, Loan and Building Association, each opened on January 20, 1956, and from which there was no withdrawal until the account was closed in January, 1960. Black also testified that during the years 1954, 1955 and 1956, he cashed various checks received from business operations, and built up a cash "reserve" which "would run up there several thousand dollars" (Tr. p. 583), and kept such cash at his home. While Black contended that he made a full disclosure to Edmonds of all business income, and believed it was entered on the books, the government's evidence conclusively established that all of such income was not so entered, and there is no claim by Black that Edmonds' compensation was ever increased beyond $90.00 per month, or that he did or could have received any benefit for omitting income or making improper deductions, of record.

██ The substantial amount of the omitted truck rentals as compared to the net income for the respective years may also have been considered by the jury to be a significant circumstance. The return for 1954 disclosed a taxable income of $12,780.66; the total of such truck rentals was $13,944.39. The 1955 return showed a taxable income of $20,880.65; the total of such truck rentals for that year was $15,579.55. While the improper deduction for truck rentals constituted the largest part of the claimed tax evasion, the omitted dividends and capital gains from the mutual funds were also substantial. The record herein is replete with independent substantiation of the existence of the element of willfulness (all of which may have received the consideration of the jury). In this case there are numerous items of evidence apart from the bare fact of the filing of incorrect and false returns that will sup-

port an inference of willful attempt to evade or defeat the tax. The arrangement for handling the truck rentals in such a manner that the books and records which formed the basis for the income tax returns would not disclose the receipt by Black of the proceeds of the checks; the cashing by Black of business checks without making a record thereof and the retention by him of large amounts of such cash in his home for a "cash reserve"; and the manner in which the investment in mutual funds was handled, constitute the "handling of one's affairs to avoid making the records usual in transactions of the kind", and is "conduct, the likely effect of which would be to mislead or to conceal", from which "affirmative willful attempt may be inferred". Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418; Gariepy v. United States, 6 Cir., 220 F.2d 252, 258. We believe that a jury issue was presented as to all the essential elements of the crime charged, and that the verdict of the jury is supported by substantial evidence. We deem it unnecessary to consider the other items of alleged unreported and taxable income.

Appellant asserts that the sentence was invalid because the District Court committed prejudicial errors relative to instructions to the jury.

The first such assertion relates to a portion of the trial court's instruction dealing with the use of an accountant 'in the preparation of tax returns. The portions complained of are as follows: "If the defendant had some other person keep his books and make out his income tax returns did the defendant make all his financial transactions available to that person? If you find he knowingly did not, what motive did the defendant have for withholding information as to income from the person making out his income tax return?" and

"It would present a somewhat startling situation if a defendant charged by law with a duty of filing his income tax return, could sign and cause to be filed a return made with the intent by the defendant to defraud the government and

escape punishment by disclaiming all knowledge of that which he had sponsored."

The appellant failed to object to the said instructions at the trial. Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A., provides in part:

"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

He seeks, however, to escape the effect of such failure by invoking Rule 52(b), which provides in part: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

This Court has "repeatedly held that the plain error rule should be applied with caution and should be invoked only to avoid a miscarriage of justice." Johnson v. United States, 8 Cir., 291 F.2d 150, 156. Similar pronouncements of this Court as to the noticing of plain error may be found in: Page v. United States, 8 Cir., 282 F.2d 807, 810; Bell v. United States, 8 Cir., 251 F.2d 490, 494; Kreinbring v. United States, 8 Cir., 216 F.2d 671, 674; Mitchell v. United States, 8 Cir., 208 F.2d 854, 858. We are convinced from the record that this case presents no occasion to invoke this rule.

Appellant asserts that the trial court was guilty of reversible error by giving the following instruction to the jury: "The defendant is presumed to be innocent, and that presumption continued with him until such a time as you become satisfied from the evidence of his guilt, and you must be so satisfied beyond a reasonable doubt."

In support of this contention, appellant relies strongly upon Lurding v. United States, 6 Cir., 179 F.2d 419. In that case the trial court had instructed the jury that "the law * * * presumes all persons innocent of the offense with which they are charged until such time as the proof produced by the government

establishes their guilt to the exclusion of a reasonable doubt". While that court held such instruction constituted reversible error and emphasized the difficulty of apprehending what interpretation may be placed by the jury upon the phrase "until such time", it is clear the appellate Court read it in connection with the words which followed, for it said, "If it carries to the mind the connotation that guilt is established at the conclusion of the government's proof, then the burden of proof has been shifted to the defendant. * * *" and "Such inept phrasing should be zealously guarded against unless accompanied by some instruction that directs a consideration of all the evidence."

It should be noted that the instruction criticized by appellant, and quoted above, is a portion of a paragraph relating primarily to the indictment. The entire paragraph is:

"I have read the indictment to you. This indictment constitutes no evidence whatsoever of the defendant's guilt and is not to be considered by you in that connection whatever. It ought not in your minds create even a suspicion of guilt upon his part. The indictment is merely the formal charge by which a criminal case such as this is brought into this court, and the fact that an indictment has been returned ought not to be considered as any evidence of the guilt of the defendant. Its sole function is to identify the offense with which the defendant is here charged. The defendant is presumed to be innocent, and that presumption continues with him until such a time as you become satisfied from the evidence of his guilt, and you must be so satisfied beyond a reasonable doubt."

Subsequently in the instructions the jury was adequately and correctly instructed as to the law concerning the presumption of innocence and reasonable doubt. No purpose would be served by quoting such additional instructions in full, but portions thereof are illustrative: "The defendant is presumed to be innocent and the burden is upon the government to prove the guilt of the defendant beyond a reasonable doubt. The presumption of innocence as described is a substantial right which the law affords to a defendant, and it follows the defendant throughout this trial and entitles him to an acquittal at your hands unless the guilt of such defendant has been proven to your satisfaction and beyond a reasonable doubt."

"If upon consideration of all the evidence there is a reasonable doubt of the guilt of the defendant remaining, the accused is entitled to the proof of that doubt by an acquittal, * * *." "The term 'reasonable doubt' which I have just used, has a very definite meaning, and I will tell you what it means: A reasonable doubt, members of the jury, is a doubt based on reason, and which is reasonable in view of all the evidence. If, after an impartial comparison and consideration of all the evidence, you candidly can say that you are not satisfied of the guilt of the defendant, you have a reasonable doubt * * *."

The attention of the jury was thus repeatedly directed to the necessity of considering all of the evidence, and was specifically instructed that the presumption of innocence "follows the defendant throughout this trial". These subsequent instructions and the one to which appellant objects, must be considered together, as a whole. From such consideration we are satisfied that the criticized instruction was not prejudicial to the appellant, and that the jury was fairly charged.

See and compare: United States v. Senior, 7 Cir., 274 F.2d 613, 616.

Appellant insists that the instruction regarding the effect of evidence of good character was insufficient and prejudicial. This instruction was as follows:

"Evidence has come into this case of the previous reputation of the defendant —good reputation. If you should find to your reasonable satisfaction that the reputation of the defendant, before the arising of the facts upon which the present charge was based, was good, then you are to consider such fact, together with all the other facts and circumstances of

the case, because the production of such proof goes to the matter of reasonable doubt. It is admitted for the reason that the law decrees that a man of previously good reputation is less likely to commit a crime than one of bad reputation. But if all the evidence in the case, including that which has been given on the matter of previous good reputation, convinces you of defendant's guilt beyond a reasonable doubt, then his previously good reputation cannot excuse, or mitigate, or palliate his guilt to any extent whatsoever." Appellant's objection thereto is "that it does not tell the jury that the reputation alone can create the reasonable doubt, a reasonable doubt sufficient to permit the acquittal of the defendant. In other words, that alone could create a reasonable doubt". His contention is based upon Edgington v. United States, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467, 468, wherein the Supreme Court of the United States stated:

"* * * the decided weight of authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing." Appellant's interpretation of Edgington is that therein the Supreme Court laid down the rule that when a defendant offers evidence of good character the jury must be instructed that character testimony may be such that it alone may create a reasonable doubt, although without it the other evidence would be convincing, and that failure to give such instruction constitutes reversible error. Relying on Edgington, the Courts of Appeals for the Seventh and Tenth Circuits have adopted such a rule. However, this Court is one of a majority whose interpretation is to the contrary. In Petersen v. United States, 10 Cir., 268 F.2d 87, at page 89 (footnote 3.), that Court stated:

"3. The rule that character evidence alone may create a reasonable doubt is

recognized in the 7th and 10th circuits. (Cases cited). The rule is rejected in the 2nd, 3rd, 4th, 5th, 6th, 8th, 9th, and D.C. circuits. (Cases cited)."

In Petersen, supra, in a special concurring opinion, Murrah, J., after a careful discussion of the conflicting views, expresses agreement with the majority view and states that (p. 90), "I should not hesitate to recede from our previous pronouncements."

In Sunderland v. United States, 8 Cir., 19 F.2d 202, 215, this Court said:

"The authorities are conflicting on the question whether a defendant in whose behalf evidence of good character has been introduced, is entitled to an instruction in the exact words used in the opinion in the Edgington case, viz: 'The circumstances may be such that an established reputation for good character * * would alone create a reasonable doubt, although without it the other evidence would be convincing.' * * * This court is committed to the negative view."

Nothing is said by the Supreme Court in Michelson v. United States, 335 U.S. 469 (wherein, at page 476, 69 S.Ct. 213, 93 L.Ed. 168, Edgington is discussed) which we interpret as being inconsistent with our interpretation of Edgington as expressed in Sunderland, or which would cause us to recede from our position taken therein.

Under the circumstances of this case, we are of the opinion that appellant was not entitled to the requested instruction, and that the instruction given was adequate and correct.

The final instruction complained of is as follows:

"When a defendant in a case of this kind takes the stand—which he has a perfect right to do—he is subjected to all the obligations of a witness, and his testimony is to be treated like the testimony of any other witness; that is to say, it will be for you to say, remembering the matter of his testimony, and the manner in which he gave it, his cross-examination, and everything else in the case, whether or not he told the truth. Then,

again, it is for you to remember—you have a perfect right to do so, and it is your duty to do so—the very vital interest the defendant has in the outcome of this case.

"Now, this does not mean, and I do not mean to imply that whenever a man is accused of a crime and takes the stand in behalf of himself, that he will naturally commit perjury; but, of course, as a defendant places himself as a witness upon the witness stand, he stands like any other witness.

"But, his interest, or bias, or anything else that may affect his testimony, is a matter which, of course, you as jurors should consider. Therefore, I say to you, in considering the testimony of the defendant, you are to consider the very vital interest which he has at stake in this case."

A similar instruction was carefully considered and sustained by this Court in Foley v. United States, 8 Cir., 290 F.2d 562, cert. den. 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 88.

However, appellant contends that Foley is inapplicable because of the disparity in the evidence of the two cases, and because the criticized charge herein "is made more prejudicial by portions of two other charges which bear directly upon it."

One of the "two other charges" referred to is a not unusually worded instruction relating to the credibility of the witnesses and the weight to be given their testimony. Included therein is the instruction that "In weighing and reconciling the testimony, you should look to * * * the lack of interest, or interest, of any witness in the case * * * to the reasonableness or unreasonableness of the testimony of the witness; to its probability or improbability, and whether the witness has made contradictory statements or not, about material matters involved in this case; and having thus carefully considered all the matters, you must fix the weight and value of each and every witness and of the evidence as a whole." and,

"If you should conclude that a witness has wilfully testified falsely to some material matter in the case, you should consider that in determining the credibility of the rest of such witness' testimony, as well as the part which you feel to have been wilfully false.

"I do not mean to say to you that any witness has wilfully testified falsely to any material matter in this case. I give you the rule that you may use it in your good judgment, as the facts in this case warrant and justify * * *."

The remaining "other charge" is that which related to the use of an accountant in the preparation of income tax returns, and which has hereinbefore been considered.

The basic contention of appellant as we understand it is that the criticized instruction was directed specifically to the appellant's testimony and was prejudicial in that it pointed "the finger of suspicion at him as being more likely to testify falsely and commit perjury than would Edmonds"; that the charge relating to the credibility of the witnesses and weight to be given their testimony was intended to apply, and did apply, to all witnesses (including Edmonds) except appellant; that the jury in effect was charged to use a different standard as to Black's testimony from that to be applied to the testimony of Edmonds (the testimony of these two men having been in sharp conflict); and that the use of the word "perjury" was suggestive of the possibility of the defendant having perjured himself on the witness stand and may have planted in the minds of the jurors a suspicion that the trial court thought the defendant had or might have perjured himself.

In general we believe this Court's observations in Foley, supra, are applicable, wherein this Court said: "It has long been recognized that while a court 'is not at liberty to charge the jury directly or indirectly that the defendant is to be disbelieved because he is defendant,' an instruction may properly point out the defendant's special interest in the case."; and "Neither are we persuaded that the

trial court's reference to perjury constituted error."

While the testimony of Black and that of Edmonds was squarely in conflict on material issues, the determination by the jury as to which was entitled to credit was not necessarily the determinative factor in arriving at the verdict. Portions of Russell's testimony were not in accord with that of Black. Numerous items of circumstantial evidence were presented to the jury upon which a reasonable inference of willfulness on the part of Black (the vital fact issue) might have been based. The record included portions of Black's testimony which the jury might, with justification, have considered inconsistent.

We consider the argument that such instruction, considered jointly with other portions of the charge pointed out by appellant, allowed the jury to apply different standards in measuring the testimony of Black and of Edmonds, respectively, is without merit.

Though the instruction to. which objection is here made does relate specifically to the appellant, it should be noted that the trial court charged therein that "his (defendant's) testimony is to be treated like the testimony of any other witness * * *."

In the general instruction the jury was charged to "look to * * * the lack of interest, or interest, of any witness in the case * * *." It is clear that this included both Edmonds and Black.

It is apparent that, in sustaining a similar instruction, this Court in Foley did so in the. light of the facts of that case. Considering the facts and circumstances of this case, we arrive at the same conclusion. However, this conclusion is limited to the record before us; and is not to be construed as an approval of such instruction or as an indication that it merits being considered in the category of a standardized instruction for all cases of a similar nature.

For the reasons hereinbefore stated, the judgment of the District Court is

Affirmed.