UNITED STATES of America

v.

Irving L. FOWLER, a/k/a Colgate, Appellant.

UNITED STATES of America

v.

Zebbie D. GIBSON, Jr., Appellant.

Nos. 78–2292, 79–1050.

United States Court of Appeals, District of Columbia Circuit.

Argued June 18, 1979.

Decided Sept. 19, 1979.

As Amended Sept. 28, 1979.

Carol Garfiel Freeman, Glen Echo Heights, Md., for appellant in No. 79–1050.

John Hooper * with whom Michael Geltner, Washington, D. C. (appointed by this Court) and Larry J. Ritchie, Washington, D. C., were on the brief, for appellant in No. 78–2292.

F. Joseph Warin, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E. George and William J. Hardy, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before ROBINSON and MacKINNON, Circuit Judges, and HAROLD GREENE **, United States District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Following a jury trial, Irving L. Fowler, a/k/a "Colgate" and Zebbie D. Gibson were adjudged guilty on three counts [1] of violating the White Slave Traffic Act, 18 U.S.C. § 2421.[2] The principal criminal act for which Fowler and Gibson were indicted was that set forth in the First Count which charged that the appellants transported three young women (also referred to as victims) in interstate commerce "from the State of New York [Buffalo] to the District of Columbia for the purpose of prostitution, debauchery and other immoral purposes." [3] Concurrent sentences of two years on each of Counts 1, 2 and 3 were imposed on each defendant. Counts 2 and 3 charged illegal transportation to the District of Columbia from Maryland after the party had arrived in the Washington area from Buffalo.

Appellants contend that the convictions should be reversed because: (1) the trial court failed to conduct a hearing to determine whether the prosecutor's interview notes constituted a "statement" under the Jencks Act; (2) the trial court allowed the prosecution to introduce evidence of Gibson's financial circumstances prior to March 1978; and (3) the prosecutor referred to the general social consequences of prostitution, which had not been the subject of direct evidence.

## I. THE JENCKS ACT ISSUE

The Jencks Act, 18 U.S.C. § 3500 [4] provides that after a government witness

---

* Student Counsel.

** Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. First Count: On or about March 29, 1978, ZEBBIE D. GIBSON, JR. and IRVING L. FOWLER, also known as COLGATE, transported and caused to be transported [C, A, and D] in interstate commerce from the State of New York to the District of Columbia, and within the District of Columbia, for the purpose of prostitution, debauchery and other immoral purposes. (In violation of Title 18, United States Code, Section 2421)

SECOND COUNT: On or about March 30, 1978, ZEBBIE D. GIBSON, JR. and IRVING L. FOWLER, also known as COLGATE, transported and caused to be transported [A and D] in interstate commerce from the State of Maryland to the District of Columbia and within the District of Columbia for the purpose of prostitution, debauchery and other immoral purposes. (In violation of Title 18, United States Code, Section 2421)

The Third Count was identical to the Second Count except it charged transportation on March 31, 1978.

2. Whoever knowingly transports in interstate or foreign commerce or in the District of Columbia or in any Territory or Possession of the United States, any woman or girl for the purpose of prostitution or debauchery, or for other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; . . .

Shall be fined not more than $5,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 812; May 24, 1949, c. 139, § 47, 63 Stat. 96.

18 U.S.C. § 2421.

3. A fourth girl was also transported but her identity could not be determined and she was not named in the indictment.

4. 18 U.S.C. § 3500.

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena,

has testified on direct examination the defendant is entitled, on motion, to examine and use any "statement" of the witness that relates "to the subject matter of the testimony of the witness. . . ."[5] The statute defines "statement" as "a written statement made by said witness and signed or otherwise adopted or approved by him . . . ."[6]

At the start of the trial defense counsel was given some Jencks Act material, and expressed his assent to the Government providing other material to the Court for an *in camera* inspection (Tr. Oct. 24, 1978, [Tr. I] 6). After the government witnesses testified, defense counsel requested the United States Attorney to produce any statements of the particular witness, as required by the Jencks Act (*Id.* 34–5, 95). When the Government refused to give him the prosecutor's notes, defense counsel requested *the court* to view them *in camera* as the Government had previously suggested (*Id.* 34, 6). The court then examined the notes *in camera* and ruled that they were not "statements" within the provision of the Jencks Act because they had not been "adopted" by the witness. (*Id.* 95). On this appeal appellants contend that the trial court erred in failing "to conduct any hearing to determine whether" the prosecutor's notes constituted a "statement" under the Jencks Act. However, the defense never requested a hearing but merely, as previously stated, requested that the court view the notes *in camera*. It also appears that counsel had an opportunity for all the hearing that would have been necessary. When the witnesses who gave the statements

discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said de-

fendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.
As amended, Pub.L. 91–452, Title I, § 102, Oct. 15, 1970, 84 Stat. 926.

5. *Id.,* (b).

6. *Id.,* (e)(1). Subsections (2) and (3) further broaden the definition of "statement" but they are not relevant here.

were on the stand counsel could have inquired whether they adopted, signed or otherwise approved any written statement made by them and thereby laid the foundation necessary to require production under the Jencks Act. We thus fail to find any error in the court's handling of the matter.

■ We have also examined the prosecutor's interview notes, which the court sealed. From such examination we similarly conclude that the notes were not required to be produced under the Jencks Act. The notes, are short, very cryptic, and only set forth a few references to scattered facts; they are incomplete and could do nothing more than jog the prosecutor's memory as to a few items. Accordingly, they fall far short of being "statements".

In short, the court was able by merely examining the notes and recalling the witness' testimony to conclude that there was no showing that the notes constituted "statements" under the Jencks Act. In addition the notes are not signed by the witness and the defense never produced any evidence in cross-examination of the witnesses that either of them had "adopted or approved" the notes (Tr. I 38–70, 95–124).

Therefore, the court's handling of the matter was not erroneous.

## II. GIBSON'S FINANCIAL CONDITION

■ Gibson contends that the court erred when it permitted the prosecutor to ask "questions designed to cast doubt on whether [Gibson's] income from his decorating business was sufficient to support his life style." Gibson Br. 16. The gist of his argument is that the prosecutor unfairly implied that the only way he (Gibson) could support his opulent life style was through pimping. Fowler asserts that because of his association with Gibson, he too was prejudiced by this line of questioning. Fowler Br. 15. The Government characterizes these contentions as "an effort by appellants to extract from rather innocuous and generally unobjected evidence a scenario of impermissible prejudice." Government Br. 8.

Appellants object to the prosecutor's questioning at two points in the trial. First, they refer to the testimony of Gwendolyn Clark, Gibson's fiancee and a prosecution witness.[7] During direct examination,

---

7. Q Was he [Gibson] employed at the time?
   MR. RENGELL: Objection, Your Honor. I don't think it is material.
   THE COURT: Objection overruled.
   BY MR. HARDY:
   Q Would you answer the question?
   A Mr. Gibson is self-employed.
   Q As what?
   A He's a decorator, interior decorator.
   Q Interior decorator?
   A Yes.
   Q He was taking a vacation from his interior decorator job?
   A He was taking a vacation. He didn't state anything about taking a vacation from his job. He stated he was going on a short vacation.
   Q Did he say with whom he was going on this short vacation?
   A He said he was going on a vacation with a friend, which is Irving Fowler.
   Q Do you see him here in the courtroom today?
   A Yes, I do.
   Q Do you know him by any other name other than Irving Fowler?
   A Yes. He has a name Colgate.
   Q Would you point him out, please?

A That's him over there at the defendant's table.
   Q Did, in fact, you loan your car to these gentlemen to take a short vacation?
   MR. ROSEN: Objection, she has already answered the question that she loaned him the car.
   THE COURT: Well, she has, that's perfectly true.
   Go ahead, Mr. Hardy.
   BY MR. HARDY:
   Q How long was the vacation?
   A He didn't specify any special time, any length of time.
   Q He didn't specify?
   A No, he didn't.
   Q When did you get your car back? How long did he have your car for his vacation?
   A I think it was approximately two days, two or three days.
   Q Did he have a car of his own at this time?
   A Yes, he does.
   Q Did he have one then?
   A Yes, he does.
   Yes, he did.
   Q What kind of car did he have then?
   A I think it's a '70 Marquis. It's an older car that he used for his work.

she identified the automobile pictured in "Exhibit Number 1," a 1976 Lincoln Continental, as her car. She *volunteered* that she "purchased it from Mr. Gibson." Tr. I 166. Then responding to questions, Clark stated that she paid Gibson "approximately $5600" for the car in January, 1978, (*Id.*); and that he borrowed the car in March, 1978, ostensibly for a "short vacation." *Id.* 167. Neither defense counsel objected to any part of this colloquy.

The prosecutor then asked Clark whether Gibson was "employed at the time?" Defense counsel objected for the first time, but the objection was overruled. The witness answered that Gibson was an "interior decorator." Tr. I 168. The prosecutor continued his questioning, eliciting that Gibson returned the car after about "two or three days," that he owned a 1970 Marquis at that time, and that he ran his "work" from that car rather than from an office. *Id.* 169. The prosecutor then asked whether Gibson had "racks" in his car (presumably for use in decorating) and whether he had "a truck to do interior decorating?" Defense counsel objected, and although the objection was overruled (outside the hearing of the jury), the witness never answered the question.

Appellants also take exception to certain portions of the prosecutor's cross-examination of appellant Fowler.[8] After Fowler

> Q Does he have an office for this work that you say he has?
> A No, he doesn't.
> Q He uses a '71 Marquis? Does he have racks and things like that? Does he have a truck to do interior decorating?
> MR. RINGELL: Objection.
> MR. ROSEN: Your Honor, may we approach the bench?
> THE COURT: All right.
> (At the bench:)
> MR. RINGELL: It is obvious what Mr. Hardy is trying to do. He is trying to say how does this guy get cars like this and what is he doing if he doesn't have a job and all that stuff.
> MR. ROSEN: He is getting in the back door what he can't get directly.
> MR. HARDY: I don't see the objection.
> MR. RINGELL: Irrelevant. No materiality.
> THE COURT: I think it is perfectly proper. He said he's an interior decorator. What more is there.
> MR. HARDY: That's about it. That was about the only question I had.
> (Tr. I 167–171). There were also brief references to these subjects at Tr. October 25, 1978 [Tr. II] 48–50.

8. Q Now, was Mr. Gibson on vacation also?
> A Yes.
> Q What was he vacationing from?
> A Work.
> Q What is his work?
> A He's an interior decorator.
> Q Does he have an office?
> MR. RINGELL: Objection, Your Honor, I don't see why it is material.
> THE COURT: I will permit it. This is cross-examination.
> BY MR. HARDY:
> Q Does Mr. Gibson have an office, sir?
> A No.
> Q Does he have a truck that he works out of?

> MR. ROSEN: Objection, Your Honor, it is not within the scope of direct. He is trying to get through the back door what he can't do legally.
> MR. HARDY: He has testified it was—he was on vacation.
> THE COURT: Overruled. Go ahead.
> BY MR. HARDY:
> Q Sir, does he have a truck that he works out of?
> A That he works out of?
> Q Does he have a truck, if he doesn't have an office for his interior decorating?
> A He has an old car.
> Q What kind of old car does he have?
> A About a '70 Marquis.
> Q What's a Marquis? Is that a Ford or what?
> A Oldsmobile. It is a Mercury, I believe.
> Q A '70 Marquis.
> MR. ROSEN: He has answered the question, Your Honor.
> BY MR. HARDY:
> Q Sir, what is a '70 Marquis?
> A It is a Mercury.
> Q Mercury. I am sorry. Okay. Now, he uses this in his business of interior decorating?
> A Yes.
> Q I see. Now, you've heard the testimony that he sold the Lincoln to Miss Clark for her $5,600.
> A Pardon me?
> Q Did you hear the testimony from Miss Clark that she bought the Lincoln that he used to have, the '76 Lincoln for $5,600?
> MR. ROSEN: Your Honor, there is an objection. This is not within the scope of direct. It is just a scattergun approach. He is trying to bring in everything. I think it is not proper cross-examination. I vehemently object.
> THE COURT: Overruled.
> BY MR. HARDY:
> Q Sir, did you hear that testimony?

testified that he drove to Washington with the four women for a "vacation," the prosecutor asked whether Gibson was also on a vacation. Fowler answered that Gibson was "on vacation . . . [from] his work . . . [as] an interior decorator." Tr. II 48. The prosecutor asked whether Gibson had an office, and after the objection by defense counsel was overruled, Fowler said no. The prosecutor then asked if Gibson "work[ed] out of" a truck. Id. 49. The defense objection was overruled, and Fowler explained that Gibson used a 1970 Mercury Marquis in his work. The prosecutor concluded this colloquy by asking a series of questions about the 1976 Lincoln that Gibson sold to his fiancee. Objections were overruled, and Fowler stated that Gibson did not use the 1976 Lincoln in his interior decorating business. Id. 49–50.

Taken together, the two colloquys identified by appellants included the following testimony: (1) Gibson sold a 1976 Lincoln Continental to Clark for $5600; (2) Gibson borrowed the car from Clark for his "vacation" to Washington, D.C.; (3) Gibson was an interior decorator; (4) Gibson used a 1970 Marquis in his interior decorating business; (5) Gibson did not have an office; and (6) Gibson did not use a truck in his business. Defense counsel contends that questioning about these matters substantially prejudiced appellants' right to a fair trial, and therefore that they are entitled to a new trial. We disagree.

First, most of this numbered testimony was elicited without objection. Defense counsel never objected to Clark's testimony that Gibson sold the 1976 Continental to her (1); that he borrowed the car from her for his vacation (2); and that Gibson ran his business from his 1970 Marquis, rather than an office (4, 5). Under the Federal Rules of Evidence,

[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record . . . .

Fed.R.Evid. 103(a). "If testimony, even though improper, is introduced into evidence without objection, it becomes part of the record and is available to be considered for its probative value by the trier of fact." *United States v. Jamerson,* 549 F.2d 1263, 1267 (9th Cir. 1977). Courts will make an exception to this rule "only if the admission of the testimony constituted plain error affecting substantial rights." *United States v. Dawson,* 576 F.2d 656, 658 (5th Cir. 1978), cert. denied, 439 U.S. 1127, 99 S.Ct. 1043, 59 L.Ed.2d 88 (1979). *Accord: United States v. Popejoy,* 578 F.2d 1346, 1350 (10th Cir. 1978), cert. denied, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1979); *United States v. Smith,* 160 U.S.App.D.C. 221, 226, 490 F.2d 789, 794 (D.C.Cir.1974). See Fed.R.Evid. 103(a) and (d), Fed.R.Crim.P. 52(b). In other words,

[i]n order to require a new trial, the prejudicial effect of improper matter, viewed in the context of the particular trial, must not be overwhelmed . . . by evidence of guilt. Rather, a significant possibility must exist that, considering the other evidence presented by both the prosecution and defense, the statement had a substantial impact on the verdict of the jury.

*United States v. Archbold-Newball,* 554 F.2d 665, 680 (5th Cir.), cert. denied, 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977). As we explain *infra,* the Government's case is "exceptionally strong." Since appellants have not established that the testimony at issue here was critical to the Government's case, we hold that admis-

A  Yes.
Q  Did you know when he had the '76 Lincoln?
A  Yes.
Q  Did he use that, did he have the other car at the same time?
A  The older car?
Q  The older car.

THE COURT: You can answer that yes or no.
THE WITNESS: No.
BY MR. HARDY:
Q  So did he use the '76 Lincoln in his interior decorating business?
A  No.
Tr. II 48–50.

sion of that testimony was not error, much less plain error warranting a new trial.

Second, we are not persuaded that the trial court erred in admitting the testimony that was objected to. The prosecutor's questions, which established that Gibson borrowed from his fiancee the 1976 Lincoln Continental was used to transport the four women to the District of Columbia, were relevant. Interstate transportation is one of the principal elements of the offense, and how this was accomplished, who drove, who furnished the car, who paid the expenses, who arranged a place for the young women to stay, etc., is probative of one of the principal elements of the offense that the Government must prove beyond a reasonable doubt. Moreover, Fowler claimed that appellants went to Washington on a "vacation." It was vacation from school for Fowler but vacation from *work* for Gibson. Gibson's fiancee, who was hardly an impartial witness, also testified that he borrowed the car for a "short vacation." Tr. I 167. It was thus permissible for the prosecutor to explore the *vacation defense* further. The suggestion that appellants were on vacation implied that they engaged in a regular occupation or activity other than pimping. The prosecutor was entitled to test the *bona fides* of this claim, for if either appellant had no regular business or activity other than pimping, then the trip to Washington would hardly be a "vacation." It certainly was no intended "vacation" for the young women.

## III. THE STATEMENT MADE IN ARGUMENT AS TO SOCIAL POLICY

Appellant Fowler contends:

The prosecutor, during his rebuttal argument, attempted to prejudice Fowler's defense by bringing matters to the jury's attention that had absolutely no basis in evidence. After characterizing the offenses charged against the defendants as "dirty" and "salacious", he continued:

What's really dirty is putting the women to prostitution because of the Clark and Eubanks show. (Mr. Ringell, Gibson's attorney) said they are innocent

of selling themselves on the street, that is not an innocent act, but what they are innocent about is the consequences of what happens to them when they are prostitutes, sold between pimps, addicted to narcotics. (Tr. Oct. 25 at p. 113).

These remarks strongly suggested to the jury that they should consider, while deliberating the *specific* charges against the defendants, the *general* social consequences of prostitution related activity—especially the selling of women among their pimps *and* the addiction of prostitutes to narcotics. The prosecutor, however, had introduced no evidence during trial to support any of his assertions. Fowler's attorney made an immediate objection to the remarks, which the court overruled by saying it would "*take judicial notice of things.*"

Fowler Br. 17 (emphasis added). While it does not completely excuse the latter remark by the court, it is significant that the court's passing remark did *not* instruct the jury to take judicial notice of anything.

Gibson's counsel characterizes the prosecutor's remarks in the following terms:

In the instant case, the prosecutor, in closing argument, made improper and unwarranted references to the economic status of the transported women and to their asserted innocence of the social consequences of prostitution, including sales between pimps and addiction to narcotics.

Gibson Br. 24–25.

A complete answer to the attack on the prosecutor's remarks and the court's comment necessitates a brief review of the facts of the offense and the strength of the Government's case.

Fowler and Gibson were friends in Buffalo, New York, who induced (we use abbreviations instead of the victim's actual names) A and C to come to Washington, D.C. to "make some money" from prostitution "[b]ecause it was easier down here." Tr. I 82. The girls were both young: 20 and 18 (maybe 17), respectively. C had just finished high school and neither victim according to their testimony had ever previously

**10**

engaged in prostitution. Shortly before Fowler requested A to go to Washington he had discussed with her whether she "could prostitute and give a man the money. . ." She replied "I think so if I thought that the man was in my corner or if he was going to provide for me and take care of me." *Id.* 17. Fowler had also discussed with A: "Just whether or not I thought I could make money for a man." *Id.* 72. *Accord: Id.* 50, 74. Gibson also had a prior conversation with C about coming to Washington to "make money." *Id.* 82.

■ In the vernacular of the parties this meant to "make money" from commercial prostitution. Tr. I 72. The vernacular of various criminals is not a shield to understanding their meaning which may be the subject of evidence, inference and deduction by juries and trial and appellate courts. *Batsell v. United States,* 217 F.2d 257, 262 (8th Cir. 1954); *Parente v. United States,* 249 F.2d 752, 754 (9th Cir. 1957); *Wiley v. United States,* 257 F.2d 900, 908 (8th Cir. 1958); *Enriquez v. United States,* 293 F.2d 788, 795 (9th Cir. 1961); *Mack v. United States,* 326 F.2d 481, 484 (8th Cir. 1964); *United States v. Austrew,* 202 F.Supp. 816, 820 (D.Md.1962).

Both A and C agreed with Fowler and Gibson to come to Washington for the purpose of engaging in prostitution. When Fowler (with Gibson) picked them up in Buffalo in a 1976 Lincoln Continental, two other women that we shall call B and D, were in the car and were to be passengers on the trip for the same purpose. This appearance of a stable "[s]urprised" A and C. Tr. I 18.

The entire party arrived in the Washington area about noon and went to a house in nearby Maryland belonging to a friend of Fowler. The women then bathed, ate and rested and that night the four victims were immediately driven by Fowler with Gibson, to 14th & K Street. Tr. I 19, 84–85. On the trip to 14th Street there was "discussion on how much to accept and . . . how much you were not supposed to accept." *Id.* 20. It was agreed that the women should charge $25 for oral sodomy and $35

for sexual intercourse. *Id.* 20, 88, 107, 108. Fowler cautioned that they should "not . . . accept a smaller amount of money for what [they] were going to do with whoever". *Id.* 21. The prices C actually offered to a plainclothes police officer were within the range agreed upon. *Id.* 129.

Fowler and Gibson left the victims on 14th Street and spent the late evening and early morning hours together, apart from any of the women, in several night clubs. Tr. II 25–28. A testified that when the victims were let out of the car:

We were told [by Fowler] that a young lady would approach us and tell us all we wanted to know about working on the street in D.C.

MR. RINGELL: Excuse me, Your Honor. Could she be more specific as to who we are talking about?

THE COURT: I think that would be helpful.

THE WITNESS: I can't recall the young lady's name but—

THE COURT: She was going to come up to you; was that it?

THE WITNESS: Yes.

THE COURT: What was she going to tell you?

MR. RINGELL: Your Honor, the question is who told her this.

MR. HARDY: I think counsel will have a good opportunity in cross examination to go into these matters.

THE COURT: It would be helpful, Mr. Hardy, if we found out ahead of time.

Who told you someone was going to meet you?

THE WITNESS: Mr. Fowler did.

\*    \*    \*    \*    \*    \*

THE WITNESS: *He [Fowler] told us that a young lady would approach us and ask us if we were from Buffalo and she would give us all the information we wanted to know.*

BY MR. HARDY:

Q Did such a woman approach you?

A Yes, she did.

Q Now, what happened after you got out of the car with these instructions?

A We got out of the car and we were on 14th and we just waited until the young woman came and approached us and asked us if we were from Buffalo.

\* \* \* \* \* \*

THE WITNESS: And we told the young lady yes, we were and *she answered all the questions that we had to ask her.*

BY MR. HARDY:

Q Were you given directions as to *where to take the tricks or the Johns,* whatever they are called

A Yes.

Q Where was that supposed to be?

A She really didn't give a name of the hotel. She just pointed in a direction and she said that most of the girls in D.C. just rode around in the cars to a parking lot. I don't know the name of the street, but it's right around the corner from 14th.

Tr. I 22–24 (emphasis added).

C was arrested that evening charged with solicitation for prostitution, jailed and eventually testified before the grand jury. She never rejoined the Fowler-Gibson party. The other three victims stayed in the Washington vicinity for two more days and on both nights were transported, by Fowler and Gibson, from the house in Maryland to 14th Street to engage in prostitution. Following C's arrest Fowler and Gibson warned A, B, and D, "Just to be careful more or less." Tr. I 27. This is highly persuasive evidence of Fowler's and Gibson's knowing participation in prostitution. But despite the cautionary instructions, A and D were subsequently arrested.

At trial, Gibson refused to take the stand while Fowler testified and admitted practically all the physical facts but denied that he or Gibson knew that the women intended to engage in prostitution in Washington. The jury obviously disbelieved him and we must accept the facts most favorable to their verdict. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1, 13 (1978); *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Glasser v. United States,* 315 U.S. 60, 80, 62

S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Anderson,* 165 U.S.App.D.C. 390, 509 F.2d 312, 331 (D.C.Cir.1974), *cert. denied* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975).

The facts here are typical of those in the reported Mann Act cases, except that the case against appellants is exceptionally strong, and appellants' crimes are particularly egregious. Fowler and Gibson involved very young women, one just graduated from high school, in commercial prostitution. This was not merely a personal venture with two young friends. When appellants "surprised" A and C by showing up with B and D for the trip to Washington, it became apparent that they had recruited a "stable" and that for them prostitution was big business. Appellants' knowledge of "white slave" traffic was corroborated by the rapidity with which they dumped the four victims at 14th and K Streets, the local center for on-street prostitution. In addition, most telling is appellants' apparent relationship with an on-street representative of the local organization, whom the victims were told would meet and instruct them in the local *modus operandi.* The victims were met and instructed as promised, and it would be naive to think that this "service" was performed without prior understanding that the instructor was to be compensated from the proceeds of the prostitution. In short, Fowler and Gibson were engaged in supplying young women for what appears to be organized prostitution in Washington, and this is what Fowler must have been referring to when he told C that it "was easier in Washington."

With this background, we consider the prosecutor's statement that prostitutes are "sold between pimps, addicted to narcotics," (Tr. II 113), and the court's answer to defense objections that "[t]he jury are not naive. . . . We will take judicial notice of things." *Id.* We do not doubt that the prosecutor accurately depicted conditions that are very prevalent in the "profession." It could be argued that such facts are "not subject to reasonable dispute in

that they are either (1) generally known . . . or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed.R.Evid. 201(b). But there was never any proffer on that basis. And while the prosecutor's statement may be accurate, not all truthful statements are admissible. Despite the prevalence of the conditions mentioned by the prosecutor, on this record the remark was error because those conditions are not relevant to the guilt or innocence of the appellants, and the court's comment was also erroneous. The question, then, is whether these errors justify reversal of the conviction and a new trial? We hold that they do not.

The test as to whether an error is reversible is delineated in *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946):

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Similarly, we stated in *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (D.C.Cir.1969):

> where timely objection was made and pressed on appeal, we must carefully examine the error committed to determine whether it sufficiently prejudiced appellants to call for reversal.
>
> . . . The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

Applying this standard, we find that the case was not close, that the comments did not address any essential factual element in the case that was relevant to the guilt or innocence of the defendants, that it is common knowledge that prostitution is a very great evil, that the jury were instructed to consider only testimony "heard . . . from the witness stand [and] the single exhibit" (Tr. II 120), and that the verdict was not "substantially swayed by the error." *Kotteakos, supra.* We therefore conclude that no substantial rights of appellants were affected, and that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The convictions are affirmed.

*Judgment accordingly.*