**Michael C. SANSONE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 17399.**

United States Court of Appeals Eighth Circuit.

July 17, 1964.

Certiorari Granted Oct. 26, 1964. See 85 S.Ct. 159.

---

Merle L. Silverstein, St. Louis, Mo., made argument for appellant and filed brief with Stanley M. Rosenblum, of Rosenblum & Goldenhersh, St. Louis, Mo., and Thomas Wadden, Jr., Washington, D. C.

William C. Martin, Asst. U. S. Atty., St. Louis, Mo., made argument for appellee and filed brief with Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

Michael C. Sansone, age 41, after a plea of not guilty, was convicted by a jury of a willful and knowing attempt, in violation of 26 U.S.C. § 7201, to evade and defeat his federal income tax for the calendar year 1957. He had been charged in a 2-count indictment with a violation of this statute for both 1956 and 1957 but was acquitted as to 1956. Judge Harper imposed a $2,000 fine and a 15-month sentence. The defendant appealed.

The case comes down to the omission from Sansone's 1957 return of about $20,000 in long term capital gain realized upon the disposition of real estate. That the gain was realized, that it was not reported, and that it should have been reported are conceded by the defense.

The issues are (A) whether the admissible evidence established the essential element of willfulness on the part of Sansone and (B) whether he was entitled to lesser-included-offense instructions. On the first issue the admissibility of an after-the-fact affidavit executed by Sansone and given to an investigating intelligence agent assumes vital importance.

The objective facts are not in dispute. Sansome and his wife in 1956 and 1957 lived in a Saint Louis suburb. They filed joint returns for both years. Their 1957 return as filed showed adjusted gross income of $7,585 and taxable income of $2,963. The income reported consisted of Mrs. Sansone's salary as a teacher, sums received by Mr. Sansone from the Department of the Air Force, and his net income as a securities salesman. It was stipulated that the taxpayers earned and received these items in 1957. The return disclosed no capital gain or loss and no other income.

On December 6, 1955, Sansone obtained from House Hunters, Inc. an option to purchase certain land in Saint Louis County. In the following February he exercised this option and a contract for sale was signed. It ran from the vendor to the Sansones. It specified a price of $22,500, payable $17,500 in cash and $5,-000 by a purchase money deed of trust on part of the real estate.

Sansone at the same time effected a sale of a portion of the land to D–X Sunray Oil Company for $20,000. Land Title Insurance Co. of St. Louis handled both Sansone's purchase and his sale to Sunray. It closed the two transactions simultaneously and issued the Sansones its check for $2,891.71. This was the amount remaining after appropriate charges and after debiting the Sansones for their $22,500 purchase price and crediting them for the $20,000 Sunray proceeds plus the deed of trust obligation. Both deeds were filed for record on March 21, 1956. This Sunray transaction resulted in 1956 gain which was not reported and which was the subject of the first and acquitted count of the indictment.

In August 1957 Sansone sold another portion of his tract. This was to Tremarco Corporation and was for a gross price of $27,000. This time Land Title issued the Sansones its check for $21,-671.67, representing the net payable to them after vendor's expenses and after payment of the amount due on the deed of trust. The deed to Tremarco was immediately recorded. This Tremarco transaction resulted in 1957 gain which was not reported and which was the subject of the second and convicted count of the indictment.

In summary and to repeat: The defendant purchased a tract of land in March 1956 for $22,500. He promptly sold a portion of the same land for $20,-000. In 1957 he sold another portion for $27,000. The gains realized on these respective sales were not reported in the Sansone returns for 1956 and 1957.

On the question of willfulness the government's case rested primarily upon the testimony of Steve Milosevich, of Revenue Agent John J. Conley, and of the defendant himself, and upon Sansone's own written statement hereinafter mentioned. Because of the difficulty and sensitivity of the issue, we review this evidence in some detail.

Milosevich was Mrs. Sansone's brother. He operated a delicatessen-sandwich shop. He had had some experience as a junior accountant. He prepared the Sansones' 1956 and 1957 returns. He testified that at the time he prepared the 1956 return he was "not sure" he had information that the Sansones "had a real estate transaction" but "I think at that time I may have been aware that there was" one. He also said that he prepared the 1957 return from work sheets presented to him by the taxpayers; that there was no information on those sheets pertaining to any real estate transaction other than real estate taxes paid; that again he was "not sure" whether he knew at the time he prepared the return that the Sansones had sold a piece of property; and that he learned about the real estate transaction through conversations with the Sansones but that he did not "recall exactly when it was".

Conley was a special agent with the Intelligence Division. He and Agent Purk conferred with the Sansones in May 1960. They then lived in Phoenix, Arizona. The agents saw the defendant at his home on three successive days beginning May 3. On May 5 Conley took from the defendant a written statement subscribed and sworn to by Sansone before Conley and denominated an affidavit. This was prepared by Conley. It was admitted into evidence at the trial over objection. The statement twice recites that it was made voluntarily and goes on to state that the affiant understood it, that it was made without threat or promise of immunity, and that he had been advised as to his constitutional rights. It further recites that the Sansones' returns for 1956 and 1957 (and for 1958) were prepared by Milosevich from work papers compiled by Mrs. Sansone, and

"I did not report the 1956 sale in our 1956 joint income tax return because I thought that I was entitled to recover my entire cost before reporting any sales in my income tax returns. I did not report the 1957 sale in our joint income tax return for 1957 because I was burdened with a number of financial obligations and did not feel I could raise the money to pay any tax due. It was my intention to report all sales in a future year and pay the tax due. I knew that I should have reported the 1957 sale, but my wife did not know that it should have been reported. It was not my intention to evade the payment of our proper taxes and I intended to pay any additional taxes due when I was financially able to do so.

"My brother-in-law, Steve Milosevich, knew that we had this real estate and had made several sales, but he did not advise us whether or not to report the 1956 and 1957 sales and the matter was not discussed with him as he merely prepared the returns from the workpaper we gave him in these years."

Conley testified that he adjusted the 1956 return to reflect the Sunray sale; that this was a short term capital gain; that he determined basis on the part sold by allocating to it a portion of the cost of the entire tract; that this allocation was based on assessed valuations approved by the Sansones on Land Title's closing statement; that he adjusted the 1957 return to include the long term capital gain on the sale to Tremarco; and that he used the assessed valuation method for determining basis of the Tremarco tract.

On cross-examination Conley testified that there are a number of approved methods for apportioning cost; that when Agent Purk made allocations for the later actual payment of the tax he used a method based on front footage; that the Sansones produced for the agents all the documents they requested, and made a place available for them in which to work; that, apart from the omission of the sales in the returns, he found no evidence that the defendant attempted to conceal any part of these transactions; that the checks the Sansones received were deposited without concealment; that the affidavit did not

cover all the discussions had with the Sarsones; that they discussed Fish Pot Creek which ran through the real estate; that, although the defendant was not present when the affidavit was typed, he had approved a rough draft and was given the opportunity to add anything he wished; that he examined the Sansones' bank statements; that their May 1958 statement showed a balance of $9,286.74; and that Sansone had said he wanted to pay his tax.

The defense for the 1957 case is largely concerned with Fish Pot Creek. This stream ran through the Sansone property west of the portions sold to Sunray and Tremarco. The claim is that Sansone was confronted with large capital expenditures required to correct conditions which the creek had created; that these expenditures would be far greater than any gain realized in the 1957 sale; that any meaningful development was necessarily delayed until the Missouri Highway Commission concluded its plans for improvements to Manchester Road which bordered the property at the south and under which the creek flowed; that Sansone honestly believed that he could wait until these expenditures were ascertained and then determine whether he had any gain on the entire tract; that, although he now knows this was erroneous, it nevertheless was an honest belief which he held when his returns were filed; and that he did not intend to avoid payment of any taxes.

In support of this defense Sansone himself took the stand. He testified that his own average income in 1954 through 1956 was around $3,000 to $3,200 annually; that he desired to supplement this by acquiring a piece of property to develop; that he first saw the land in question in the winter of 1955–56 when the creek did not appear unusual; that during that winter he learned of the Commission's plans to widen Manchester Road and to straighten the creek; that in the spring he found that the stream overflowed and contained raw sewage which created an odor and a mess; that he received many complaints that summer from the mayor; that he consulted an architect in late 1956 to inspect the property and to see what could be done; that he was repeatedly in touch with the Highway Commission to ascertain their plans but was never able to find out what they were; that he did purchase the property and make the sales to Sunray and Tremarco; that he did not report the Sunray sale in his 1956 return because he had paid more for the property than the amount of that sale and thus had not recovered his cost; that he was told it would take a minimum of $40,000 to correct the creek; that in 1957 the creek conditions were even worse; that he received more complaints from the mayor; that he tried to fix the creek a little himself but was unsuccessful; that he often called the Commission but remained unable to get any definite information from them; that the mayor told him that he did not have the responsibility to fix the creek until the Commission produced its final plans; that the 1957 return was prepared near the last day for filing in April 1958; that by then the Tremarco sale had been closed; and that he did not report that sale because he had been told he would have to fix the creek, because he felt the forthcoming substantial expenditure on that project was part of his cost, and because he honestly believed he didn't have to report the sales until he had recovered his entire anticipated cost. He also testified that he had told Agent Conley of the coming expenditure on the land; that it was not true, as stated in the affidavit, that he was burdened financially and could not raise money to pay any tax due; and that he was then better off financially than he ever had been. He said that he told Conley the affidavit was not complete and that it contained inaccuracies.

An architect testified that Sansone had asked him to inspect the property; that he did so in the fall of 1956; that he quoted Sansone the $40,000 minimum figure; and that he also told him it would be "stupid" to attempt this project until it was known exactly what the Highway Commission was going to do. The mayor

testified that the creek had been a constant source of complaint; that he talked with Sansone on numerous occasions and told him some corrective measures would have to be taken; that he himself had attempted to accelerate the development in that area; and that he told Sansone he did not expect him to make the permanent improvement until the Commission determined its plans.

A consulting engineer also testified for the defense. He, through a corporation, owned an interest in the property immediately across Manchester Road. He told of necessary corrective measures which were required, of their cost, of discussing this problem with Sansone, and of the lack of positive information from the Commission.

A. Willfulness. The defense argument is that the record is devoid of any legally significant evidence of willfulness; that Sansone's affidavit reciting "I knew I should have reported the 1957 sale" was the only evidence indicating improper intent; and that this admission is uncorroborated and is therefore unavailable to establish the charged crime's necessary element of willfulness.

▌ The defense at this point presses upon us certain legal propositions:

1. An intent to evade or defeat the 1957 tax is an essential element of the crime under § 7201. Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Canton v. United States, 226 F.2d 313, 322 (8 Cir. 1955), cert. denied 350 U.S. 965, 76 S.Ct. 433, 100 L.Ed. 838.

2. Willfulness is not to be inferred "from the mere understatement of income", unaccompanied by such things as a consistent pattern of underreporting large amounts of income or the failure of the taxpayer to include all his income in his books and records. Holland v. United States, supra, p. 139 of 348 U.S., 75 S.Ct. 127; Blackwell v. United States, 244 F.2d 423, 429 (8 Cir. 1957), cert. denied 355 U.S. 838, 78 S.Ct. 49, 2 L.Ed. 2d 50; Black v. United States, 309 F.

2d 331, 337 (8 Cir. 1962), cert. denied 372 U.S. 934, 83 S.Ct. 880, 9 L.Ed.2d 765.

3. A defendant's after-the-fact and out-of-court admission of an essential element of an alleged crime requires corroboration. The same is true of exculpatory or explanatory statements. And

"Each case has its own facts admitted and its own corroborative evidence, which leads to patent individualization of the opinions. However, we think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti*. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. * * It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt."

Opper v. United States, 348 U.S. 84, 89–93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954). These principles are applicable to the crime of tax evasion where "there is no tangible injury which can be isolated as a corpus delicti" and "where the corroborative evidence must implicate the accused in order to show that a crime has been committed" and, specifically, where the statement is given to an investigating government official. But

"It is agreed that the corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a

whole proves beyond a reasonable doubt that defendant is guilty. * * All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused. * *

"Under the above standard the Government may provide the necessary corroboration by introducing substantial evidence, apart from petitioner's admissions, tending to show that petitioner willfully understated his taxable income."

Smith v. United States, 348 U.S. 147, 153–159, 75 S.Ct. 194, 199, 99 L.Ed. 192 (1954). See also, United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202 (1954), and Wong Sun v. United States, 371 U.S. 471, 489, 503, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

This court has recognized these principles and, as the defense suggests, the "requirement of corroboration by substantial independent evidence has not been taken lightly by this court". See, for example, Banks v. United States, 223 F.2d 884, 886–887 (8 Cir. 1955), cert. denied 350 U.S. 986, 76 S.Ct. 472, 100 L.Ed. 853; Canton v. United States, supra, p. 317 of 226 F.2d; Zacher v. United States, 227 F.2d 219, 223–224 (8 Cir. 1955), cert. denied 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 858.

The government does not quarrel with these rules as such. The controversy, as is so often the case, lies in their application.

At this point we note that the defense appears to concede that if the Sansone affidavit is admissible it serves to establish every element of the government's case not supplied by other proof. This narrows the issue and we accept for present purposes the defense statement of it:

"[U]nder a full and fair review of the entire record in this case what independent evidence is there to corroborate and make trustworthy the appellant's admissions as to his intent with respect to his 1957 return and, if there is such independent evidence, is it truly substantial? * * [H]ere he either stands or falls."

We deal here with a state of mind which is a subjective element. In Blackwell v. United States, supra, Judge Van Oosterhout, in speaking for this court, said, p. 429 of 244 F.2d: "Willfulness involves a state of mind. Direct proof of willfulness is seldom available". He made essentially the same observation in Zacher v. United States, supra, p. 224 of 227 F.2d. Many of the decided and cited cases are concerned with objective evidence and its proof. Opper, Smith, Calderon, Banks, Canton, and Zacher, all supra, are examples of this. But there are also cases which concern the subjective. See Smoot v. United States, 114 U.S.App.D.C. 154, 312 F.2d 881 (1962); United States v. Sapperstein, 312 F.2d 694 (4 Cir. 1963); Scarbeck v. United States, 115 U.S.App.D.C. 135, 317 F.2d 546, 565–569 (1963), cert. denied 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077. These are significant and helpful here.

We conclude without great difficulty that, within the words quoted from the defense brief, there is independent evidence in this record "to corroborate and make trustworthy the appellant's admissions as to his intent with respect to his 1957 return" and that such independent evidence is "truly substantial". We find this corroboration and this substantiality in the following:

(1) The omission in the 1956 and 1957 returns of the gains realized on the real estate sales; (2) the inclusion in the 1956 return, with full description, of no less than 13 separate short term capital gains and losses on securities, thereby demonstrating the defendant's awareness of the income character of a capital gain and of its measure; (3) the defendant's receipt through the two real estate sales of cash totaling more than $24,500 over and beyond his cost of the entire property, that is, after satisfaction of pur-

chase obligations and attendant expenses; (4) the omission of any reference to the sales or their proceeds in the work papers supplied to Milosevich, despite the fact that the 1957 check from Land Title was for over $21,000 and represented the Sansone's largest cash receipt of the year; (5) the defendant's direct testimony that his financial condition in April and May 1958 was better than it ever had been in his life; (6) his possession of an education somewhat beyond the high school level; (7) his attainment of the rank of Major in the Air Force Reserve; (8) his experience, although not an extensive one, as a securities and real estate salesman; (9) his holding of a Missouri real estate salesman's license which, under Missouri law, presumes certain competency and requires an examination, V.A.M.S. § 339.040; (10) his obvious awareness of income tax details as demonstrated by the appearance in both or one of the 1956 and 1957 returns of an exemption for his mother-in-law; of percentage deductions for (a) the expense, including depreciation, of his Cadillac automobile; (b) his telephone bill, and (c) heat and electric charges for his "home office"; of a deduction for "promotion and entertainment"; of deductions for uniforms and an automobile accident; and of the marking, in part for credit and in part for refund, of claimed overpayments due to withholding; (11) his deduction of the interest paid on the purchase money deed of trust to House Hunters, Inc. in 1956 but not in 1957 when that mortgage was paid off with the Tremarco sale resulting in the gain in question; and (12) his concession on the witness stand that he was "familiar with the reporting of capital gains".

All this in the aggregate constitutes, in our view, independent evidence of sufficiently substantial character, which, in the language of Opper, tends "to establish the trustworthiness of the statement" in the Sansone affidavit. It "supports the essential facts admitted sufficiently to justify a jury inference of their truth". And it serves to fulfill the requirement of Smith that "All elements of the offense must be established by independent evidence or corroborated admissions".

We recognize that there is some force in the defense argument (1) that the Sansones made no attempt to conceal through strawmen their participation in the real estate purchase and sales; (2) that federal documentary stamps in appropriate amounts were apparently utilized and, at least in one instance, were affixed prior to recording; (3) that the deeds were promptly filed for record; (4) that the Sunray transaction did not gross at more than Sansone's cost; (5) that Fish Pot Creek presented a serious pollution and route problem; (6) that Sansone was deeply concerned about this and reasonably anticipated the burden of a substantial capital expenditure for its solution; (7) that he also reasonably anticipated that the expenditure might consume all his available cash; (8) that the 1956 and 1957 returns, except for the real estate capital gains, were otherwise accepted as filed; (9) that his omitted income was confined to these two years and did not create a pattern over a longer period; (10) that it is known that a request for a refund often leads to audit and thus contraindicates willfulness; (11) that the reported 1956 securities gains and losses were simple in character and did not involve cost allocation; and (12) that Sansone's real estate experience was not extensive and was with a very small firm. These factors and such potency as they possess are, however, for the trier of fact. They are not for us where there is substantial opposing evidence on which the jury's verdict may properly rest. That these factors did not convince the jury on the 1957 count is not a situation which we may undo on the record before us.

B. The lesser offense instructions. The defense claims prejudicial error in the trial court's refusal to charge the jury that it could find the defendant guilty of lesser crimes than the one charged by the indictment under § 7201. The statutes concerned are 26 U.S.C. §§ 7203 and 7207.

1. Section 7203. As we have noted, § 7201 is directed toward a willful at-

tempt to evade or defeat any tax or its payment. Section 7203 concerns a willful failure to pay a tax or make a return or keep records or supply information; violation thereof is a misdemeanor and lesser punishment ensues.

This court already has been confronted with this issue under both the 1939 and the 1954 Codes. In each instance it has been decided against the defense. Dillon v. United States, 218 F.2d 97, 101 (8 Cir. 1955), cert. granted 349 U.S. 914, 75 S.Ct. 603, 99 L.Ed. 1248 and dismissed 350 U.S. 906, 76 S.Ct. 191, 100 L.Ed. 796; Janko v. United States, 281 F.2d 156, 164 (8 Cir. 1960), reversed on other grounds 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846; Foley v. United States, 290 F.2d 562, 567–569 (8 Cir. 1961), cert. denied 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 88.

 Although the issue is not an easy one, and although in Foley, pp. 568–569 of 290 F.2d, we recognized that there may be situations where, under the evidence and § 7203, a defendant is entitled to lesser offense instructions, we conclude that this is not one of those situations. Here again the offense charged by the indictment was an affirmative act, namely, a willful attempt to evade tax by filing a false and fraudulent return in which taxable income was knowingly understated; it did not rest on something less than positive, such as mere willful failure to file or to pay. The trial court's instructions as to this distinction were carefully delineated. Dillon, Janko, and Foley are pertinently applicable to the facts of the present case and we adhere to our consistent rulings in those cases.

2. Section 7207. This is directed to the willful delivery or disclosure to a tax authority of any return known by the taxpayer to be fraudulent or false as to any material matter. It does not embrace in specific language, as did its antecedent, § 3616(a) of the 1939 Code, an intent to defeat or evade an assessment.

This issue, too, has been before this court and has been decided adversely to the defense. In Janko v. United States, supra, pp. 164–167 of 281 F.2d, we noted, among other things, that the lesser included offense question here was more complex than that presented by § 7203; that § 3616(a) had been held inapplicable to evasion of the income tax, Achilli v. United States, 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918 (1957); and that § 7207's positioning in the 1954 Code and a comment in the 1954 Committee Reports were of interest. Two of us concluded, for three stated reasons, that the defendant was not entitled to a lesser offense instruction under § 7207. Judge Matthes dissented on this one issue and relied in part upon prospective comments, seemingly sympathetic with his view, which had appeared in Dillon v. United States, supra, p. 103 of 218 F.2d, and in Berra v. United States, 351 U.S. 131, 134, footnote 5, 76 S.Ct. 685, 100 L.Ed. 1013 (1956).

The issue remains difficult and close, as we recognized in Janko, and it has not been settled by the Supreme Court. Unfortunately, from the point of view of desiring a definitive answer, the Supreme Court's reversal of Janko, at the suggestion of the Solicitor General, on grounds of prejudicial publicity, a point on which this court was unanimous, left the question open. We only note in passing that the Ninth Circuit seems to agree with the conclusion the Janko majority reached. Redfield v. United States, 315 F.2d 76, 82 (9 Cir. 1963), cert. denied 369 U.S. 803. So long as the Janko holding on this issue remains unreversed on the books, we regard it as the law of this circuit.

Affirmed.

MATTHES, Circuit Judge (concurring).

In concurring, I am constrained to add a few words in regard to the lesser offense instruction under 26 U.S.C. § 7207. In my dissenting opinion in Janko v. United States, 281 F.2d 156, 171, I attempted to demonstrate that § 7207 was applicable to income tax returns. However, the failure of the Supreme Court to resolve this question in Janko v. United States, 366 U.S. 716, 81 S.Ct.

1662, 6 L.Ed.2d 846, although afforded the opportunity to do so, may lend support to the belief that my position is untenable. At any rate, a continued expression of my views would be in disregard of established realities.