**UNITED STATES of America,**

v.

**Jaynell M. IVERSON, Appellant.**

**No. 79–1231.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1979.

Decided Dec. 3, 1980.

Rehearing Denied April 3, 1981.

---

Barbara Kammerman, Washington, D.C., with whom Lawrence H. Schwartz, Washington, D.C. (both appointed by the court), was on brief, for appellant.

Pamela M. Sayad, Asst. U. S. Atty., Washington, D.C., with whom Carl S. Rauh, U. S. Atty., Washington, D.C., at the time brief was filed, John A. Terry, Michael W. Farrell, and David S. Krakoff, Asst. U. S. Attys., Washington, D.C., were on brief, for appellee.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and HAROLD H. GREENE,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by District Judge HAROLD H. GREENE.

Dissenting opinion filed by Circuit Judge TAMM.

HAROLD H. GREENE, District Judge:

 This is an appeal from a conviction of forgery, uttering, and possession of stolen mail matter. 18 U.S.C. §§ 495, 1708. The only claim of error to merit extended discussion [1] is that the jury, with prosecuto-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Appellant also claims that oral and written statements she gave at the police station should have been suppressed, that her motion for judgment of acquittal on the stolen mail charge should have been granted, and that the alleged accomplice should not have been permitted to testify at all. There is no merit to the first two contentions; the third is discussed in the text in the context of the principal claim.

Appellant's claim with respect to her statements is based on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government contends, relying on *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) that the investigators were not required to give appellant the *Miranda* warnings because she was not under arrest at the time of interrogation. We need not reach this issue because appellant was given *Miranda* warnings both orally and in writing, and she signed a form attesting to her understanding of these warnings. The district court did not credit her claim that she did not understand her rights and did not knowingly waive them, and there is nothing in the record to cause us to set aside that determination. Likewise, there is no basis for equating the questioning here with that in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In that case, statements were obtained from the accused while he was in a hospital intensive care unit, seriously wounded, barely conscious, and totally isolated. This appellant was fully conscious and aware of the significance of the questioning, and able to leave at will, and there is no basis for concluding that the statements she made were not the "product of a rational intellect and free will." 437 U.S. at 398, 98 S.Ct. at 2416.

Appellant's claim of error with respect to the denial of her motion for judgment of acquittal on the charge of possession of stolen mail matter is based on the proposition that at the time the check was stolen it was not "in the mail"

rial acquiescence, was given the erroneous information that at the time of appellant's trial her alleged accomplice, a key witness against her, had already been sentenced for her participation in the criminal venture and therefore had nothing to gain from testifying for the government.

## I

Since *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it has been clear that the prosecutorial suppression of evidence favorable to the accused, if material to guilt or punishment, is violative of due process, and that the government is affirmatively required to disclose all exculpatory materials. Moreover, both before and after *Brady*, in decisions now generally considered under the *Brady* rubric, the Court has held that a conviction obtained by the knowing use of perjured testimony violates the defendant's right to a fair trial mandated by the due process clauses of the Fifth and Fourteenth Amendments. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This rule applies both when the testimony relates directly to an essential element of the government's proof and when it affects the credibility of a crucial witness. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois, supra,* 360 U.S. at 269, 79 S.Ct. at 1177.[2]

■ In elaboration of these general rules, it is established that the prosecutor has an affirmative obligation to correct the record when a principal prosecution witness falsely claims that no promises of leniency were made, and that, should he fail to discharge that obligation, the defendant may be[3] entitled to a new trial on due process grounds. See, *e.g., Napue v. Illinois, supra,* 360 U.S. at 264, 79 S.Ct. at 1173; *Giglio v. United States,* 405 U.S. 105, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Barham,* 595 F.2d 231 (5th Cir. 1979); *Boone v. Paderick,* 541 F.2d 447 (4th Cir. 1976); *United States v. Pope,* 529 F.2d 112 (9th Cir. 1976).

Compliance with these principles in this case demanded that the prosecutor set the record straight when the principal prosecution witness falsely adduced facts which led the jury to believe that she could not possibly derive gain from her testimony against appellant.

## II

■ The evidence against appellant indicated that on May 10, 1978, she assisted one Susan Johnson in cashing a stolen, forged government check at the American Security and Trust Bank. There was ample proof that Johnson stole and forged the check,[4] and that appellant was present at and facilitated the cashing. The principal contested issue before the jury was whether appel-

and thus could not form the basis for a conviction under 18 U.S.C. § 1708. However, it is clear that an item which is properly addressed but misdelivered by the postal authorities remains "in the mail" for section 1708 purposes when it is removed from a mail depository, even if the intent to steal is formed at a later date. *United States v. Anton*, 547 F.2d 493, 495–96 (9th Cir. 1976); *United States v. Davis*, 461 F.2d 83, 87–90 (5th Cir. 1972); *United States v. Lavin*, 567 F.2d 579 (3d Cir. 1977).

**2.** The Court in *Napue* further noted that "[t]he same result obtains when the state, although

not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269, 79 S.Ct. at 1177.

**3.** See Part III *infra*.

**4.** The check, in the amount of $982.84, was made out to a third person, and Susan Johnson claimed to have found it in her own mailbox. She appropriated the check and subsequently cashed it under the circumstances described above.

lant's participation [5] was accompanied by the requisite criminal intent, or whether, as she claimed, she was duped into assisting Johnson with an illegal check-cashing transaction wholly conceived and implemented by the latter. On that issue, Johnson's testimony differed sharply from that given by appellant.

Appellant testified at trial that she merely assisted Johnson in cashing a check at a bank where appellant had a friend because Johnson herself did not have a bank account, and that she did not know that the check was stolen. Johnson, on the other hand, stated that she fully discussed the true status of the check with appellant, and that the latter assisted her in the expectation of receiving part of the proceeds. According to Johnson, she showed appellant the check, appellant stated that she knew a teller who might be able to cash it, and arrangements were made to meet the following day to complete the transaction. Johnson stated that she did sign the check at the bank in the presence of appellant [6] and after cashing it gave appellant $400 to divide with another accomplice.

Thus, Johnson's credibility was critical. In an effort to test that credibility, appellant's counsel cross-examined her regarding the status of the criminal charges against her arising out of the check-cashing incident, as follows:

"Q. You were—you haven't been sentenced in that case, have you?

A. Yes, I have.

Q. When were you sentenced?

A. The 28th.

Q. Of October?

A. Yes.

Q. What sentence did you receive?

A. I received three months' supervision. After three months, I have to go back in front of the judge that sentenced me. It was Judge Gesell. If I went by the requirements of the Court, that I could have my probation transferred to Michigan." [7]

The witness' claim that she had already been sentenced was untrue. In fact, she pleaded guilty on September 20, 1978, and her sentencing was deferred from October 27, 1978, to January 15, 1979, that is, from four weeks before appellant's trial to six weeks after that trial.[8] Her false statements had the inevitable effect of leading the jury to the erroneous conclusion that she could not gain from cooperating with the government and that her testimony was therefore unlikely to be tainted by an improper pro-government bias.[9] Yet, the

---

5. Appellant was essentially tried on the basis of being an accessory. Unlike Johnson, she was a first offender.

6. The witness acknowledged that appellant did not handle the check at any time while inside the bank.

7. Transcript at 126–27, *United States v. Iverson*, Crim.No. 79–1231 [hereinafter cited as Transcript]. When defense counsel thereafter suggested to the witness that her sentencing had been deferred to January 15 of the following year, she kept insisting that she had a "probation officer ... [and had] to abide by certain ... regulations to the Court." She added that she "had assumed that ... if I got probation ... I could go home and ... after this period of time I have got to go back in front of [the judge]." Transcript at 128.

8. The trial was held November 27–29, 1978.

9. Other incidents served further to mislead the jury in this regard.

Thus, Johnson stated that she had been expressly informed that she would receive no consideration for her cooperation with the government with respect to the charges against her, a claim that may also have been untrue. There is nothing in the record of Johnson's two sentencing proceedings or her presentence report to support that claim (Record, *United States v. Johnson*, Crim.No. 78–457, D.D.C.), and it is hardly consistent with normal prosecutorial practice. See U.S. Department of Justice, Principles of Federal Prosecution, pp. 52–53 (1980). In fact, although Johnson had a record of four prior convictions and two arrests not resulting in convictions, and although the Probation Department recommended that she be incarcerated, the prosecution dismissed two out of the three charges against her, and the Court, without objection from the prosecution, suspended the imposition of sentence and granted her probation.

Again, when the Court asked Susan Johnson, "Didn't the sentencing judge make it perfectly clear that whether you testified or not had

prosecutor, who knew or should have known [10] the actual facts, remained silent, and he did nothing to alert the Court and jury to the truth. In our view, that failure to correct the witness' misrepresentations was improper and warrants a new trial.

In practical experience, few, if any, factors are more likely to induce an accused to testify, possibly falsely, against another, than the expectation of prosecutorial or sentencing leniency.[11] Jurors are not unaware that an alleged accomplice who has not yet been charged or sentenced is susceptible to direct or indirect pressure to cooperate with the government and that his testimony should therefore be considered with special caution. *United States v. Thorne*, 174 U.S.App.D.C. 57, 527 F.2d 840 (1975); *Stith v. United States*, 124 U.S.App.D.C. 81, 361 F.2d 535 (1966). One who has already been sentenced is of course immune to this kind of pressure. For that reason when, in the context of an exploration of the issue of possible leniency in return for cooperation, a witness falsely claims that he has already been sentenced, the claim and its falsity are as damaging to the defendant's due process rights as would be a false assertion that no promise of leniency was ever made. In the one instance the witness' false claim is that he *has not* been given or promised consideration by the government; in the other that he *cannot* be given such consideration.

The record here does not affirmatively show whether Johnson was promised by the prosecution that her cooperation would be brought to the attention of the sentencing judge.[12] As it turned out, while the prosecutor did not, in fact, recommend leniency when Johnson was finally sentenced after appellant's trial, neither did he press for a stiff sentence in spite of her criminal record. Moreover, and more significantly, we do not and cannot now know what the effect on the prosecutor and the sentencing judge would have been had Johnson failed

---

nothing to do with whether you would get probation? He made that perfectly clear did he not?", she replied in the affirmative. Actually, the sentencing judge had made no such commitment, as defense counsel pointed out at a subsequent bench conference (Transcript at 145, 150). The prosecutor again remained silent, and the jury never learned the true facts. His silence, under these circumstances, represents more than a failure "to correct testimony which an appellate court . . . might view as misleading . . . ," see dissenting opinion at n. 2. The fact that it was the judge, and not counsel, who asked the rhetorical question could only reinforce the jury's belief that Johnson had no incentive to secure appellant's conviction.

In one sense, these several colloquies might imply to one well versed in criminal procedure that Johnson had not yet been sentenced. However, the dominant impression left with the jury was that sentencing had occurred prior to the trial. Indeed, the government itself still appears to believe at the present time that Johnson was sentenced before appellant's trial rather than thereafter. Appellee's brief, p. 18.

**10.** The most minimal preparation would have disclosed to the prosecutor and defense counsel the sentencing status of the principal witness. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function,* § 4.1 (Approved Draft 1971). The record is unclear as to defense counsel's under-

standing at trial. *Compare* transcript at 127–28 *with id.* at 150, 92 S.Ct. at 763. In any event, the prosecutor had an independent responsibility to alert the Court and jury to the truth. A prosecutor's use of perjured testimony represents "not just . . . misconduct, but more importantly . . . a corruption of the truth-seeking function of the trial process." *United States v. Agurs, supra*, 427 U.S. at 104, 96 S.Ct. at 2397.

> [T]hough the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice shall be done.' He is the 'servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.'

*Id.* at 110–11, 96 S.Ct. at 2400–2401.

**11.** That is so especially where, as here, the individual has a criminal record, and cooperation with the wishes of the prosecution may mean the difference between probation and a sentence to imprisonment.

**12.** Recognition of such cooperation is typically considered by judges in sentencing defendants (see, *e.g., United States v. Rosenberg*, 195 F.2d 583, 605–06 n.28 (2d Cir. 1952); *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); ABA Standards—Pleas of Guilty, § 1.8(a)(v) and comment (Approved Draft 1968)).

or refused to testify against appellant.[13] The vice in the prosecutor's silence lay precisely in its preclusion of an exploration of this and similar issues.[14]

Only by being apprised that Susan Johnson was still facing sentencing could the jury have a rational basis for deciding whether her persistent efforts to assign a share of the culpability to appellant were the product of a desire to tell the truth or an effort to ingratiate herself with the prosecutor, the sentencing judge, or both. Because the misinformation provided by the witness and the silence of the prosecutor[15] deprived the jury of the opportunity to make its own judgment concerning Johnson's credibility, it seriously flawed the proceedings.[16]

Our conclusion regarding the prosecutor's obligation in these circumstances is further buttressed by the fact that at the outset of the appellant's trial defense counsel alerted the Court and the prosecutor to his belief that Johnson would give false testimony. Counsel correctly asserted that numerous inconsistencies existed between the statement the witness gave to law enforcement officials and her grand jury testimony as well as between that testimony and the evidence she was expected to give at trial,[17] and for that reason he requested that she be prohibited from testifying. The trial court rejected the request, stating that the government's offer, arriving as it did while he was waiting to testify in this case.[15]

---

**13.** Nor can we know the witness' state of mind at appellant's trial, with her sentencing still to come, for that avenue of cross examination was effectively foreclosed by her assertion that she had previously been sentenced.

**14.** Including the issue of whether, as Johnson asserted, an Assistant U.S. Attorney had informed her that her cooperation or lack of cooperation with the government with respect to appellant's case would make no difference in the prosecution's attitude toward her own sentence.

**15.** The prosecutor not only did not at any time correct Johnson's false testimony; he actually reiterated it in his closing argument, thereby compounding the prejudicial impact:

[The PROSECUTOR]: I would suggest to you the testimony [Susan Johnson] gave when she finally came in here, having pled guilty as she said to a five-year penalty was forthright, was just the way it happened.

. . . . .

Miss Johnson on the one hand at this point had nothing to lose. Her case is disposed of. Transcript at 8, *United States v. Iverson*, Crim.No. 78–587 (D.D.C. Nov. 29, 1978).

**16.** *See United States v. Leonard*, 161 U.S.App. D.C. 36, 494 F.2d 955, 963 (1974), where we said,

The permissible scope of exploration on cross-examination is not curtailed by the absence of explicit government promises of leniency, for the defense may attempt to show government 'conduct which might have led a witness to believe that his prospects for lenient treatment by the government depended on the degree of his cooperation.' *United States v. Campbell*, 426 F.2d 547, 549 (2d Cir. 1970). Jones might reasonably have surmised that there was some connection between his testimony in this case and the

15 The fact that Jones had received immunity neither detracts nor adds from our supposition as to the possible effect on Jones of the government's offer. The point is that the jury, not an appellate court, should be permitted to make this determination on the basis of a thorough cross-examination.

The defendants were entitled to be given broad latitude in their effort to impeach the credibility of government witnesses on cross-examination. *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). *See also, United States v. Pope*, 529 F.2d 112 (9th Cir. 1976), where failure to disclose an agreement to testify resulted in a reversal even though the agreement in express terms it related only to the brother of the appellant. "It stretches credulity," said the court, that the witness "would have believed that he could refuse to incriminate the appellant before the Grand Jury without jeopardizing his hopes for a light sentence." 529 F.2d at 114.

**17.** In her original statement Johnson claimed, among other things, that the check was given to her by an individual nicknamed Shorty, that together with this individual she attempted to cash the check at several banks, that she endorsed the check so it might be cashed by Shorty, that she did not know the check had been cashed, and that she did not receive any proceeds. All of these statements were false. In her appearance before the grand jury, Johnson testified that she first saw the check when someone brought it to her on the street, that she did not know how Shorty had obtained the check, and that she did not know where he lived. All of these statements were likewise false.

possibility of perjury was inherent whenever the government relied on witnesses who had themselves been involved in the crime. Appellant argues that this ruling constitutes reversible error, but none of the cases cited[18] supports that proposition. However, in view of that factual background, the prosecutor was obligated to exercise special care with respect to the conduct of his principal witness, and when that witness proceeded to misstate crucial facts concerning her own sentencing status, he had a clear duty to speak to correct the record.

### III

We consider next whether the prosecution's nondisclosure was sufficiently material to the jury's determination of appellant's guilt to require a new trial.

■ In *United States v. Agurs, supra,* the Supreme Court established general rules concerning the appropriateness of a new trial in nondisclosure cases. Dividing undisclosed evidence situations into several categories, it held with respect to cases in which the prosecution relies on testimony

---

18. *Williams v. United States,* 382 A.2d 1 (D.C. App.1978); *Sheffeld v. United States,* 397 A.2d 963 (D.C.App.1979); *Reavis v. United States,* 395 A.2d 75 (D.C.App.1978).

19. The dissent suggests that absent perjury there is no affirmative duty on the prosecutor to correct false testimony, see dissenting opinion at n.1. But it makes no difference whether the testimony is technically perjurious or merely misleading. *United States v. Barham, supra; United States v. Ramos Algarin,* 584 F.2d 562 (1st Cir. 1978); *United States v. Anderson,* 574 F.2d 1347 (5th Cir. 1978); *United States v. Sutton,* 542 F.2d 1239 (4th Cir. 1976). Moreover, the judge at Johnson's first sentencing hearing made it quite clear that her actual sentencing would be deferred, and she voiced her assent. Thus, her subsequent testimony that she had not yet been sentenced at a minimum "skirted the edge of perjury" (*Boone v. Paderick, supra,* 541 F.2d at 450), and prosecutorial correction was required.

20. This standard is stricter than the usual harmless error rule. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Fowler,* 197 U.S. App.D.C. 208, 218, 608 F.2d 2, 12 (1979). A different and lesser standard is applied where other types of *Brady* violations are involved.

which it knows or should know to be false[19] that the conviction must be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2397.[20]

■ That is the situation here. The evidence against appellant consisted essentially of her own confession[21] and of the testimony of the bank teller and that of Susan Johnson.

The confession alone was insufficient to prove guilt, for as a matter of law it could sustain a conviction only if supported by independent evidence. *Smith v. United States,* 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954);[22] *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The teller's testimony did not provide the necessary corroboration, for it did not bear on appellant's intent and, to some extent at least, it actually supported appellant's version of the events.[23]

---

See the discussion in *Agurs,* 427 U.S. at 104–07, 96 S.Ct. at 2397–2399.

21. *See* note 1 *supra.* Except for its last sentence the confession is generally consistent with appellant's trial testimony. There is a dispute whether appellant read and adopted the page on which the last sentence appears.

22. As the Court there said (348 U.S. at 155, 75 S.Ct. at 198),

An admission which assumes this importance in the presentation of the prosecutor's case should not go uncorroborated, and this is true whether we consider the statement an admission of one of the formal 'elements' of the crime or of a fact subsidiary to the proof of these 'elements.' It is the practical relation of the statement to the Government's case which is crucial, not its theoretical relation to the definition of the case.

23. For example, Johnson testified that she and appellant decided to give the teller a gratuity and that $25 or $30 actually changed hands. The teller denied this claim. This inconsistency formed only part of the ample grounds for impeaching the credibility of Johnson. *See* note 16 *supra*; transcript at 130–43. The fact that the jury may have had a variety of reasons

Thus, the testimony of Johnson was crucial to intent and hence to guilt, for it constituted the only non-confession evidence to suggest that appellant knew that the check was stolen and would be forged and uttered. At a minimum—in the words of the *Agurs* standard—there was a reasonable likelihood that the testimony the witness gave could have affected the judgment of the jury. Since that testimony was false in a critical respect, the conviction cannot stand.

For these reasons, the judgment of conviction is reversed and the case is remanded for a new trial.

*Judgment accordingly.*

TAMM, Circuit Judge, dissenting:

Believing that any misleading testimony or prosecutorial misconduct in this case was harmless error beyond a reasonable doubt, I respectfully dissent.

Before addressing the question of harmless error, however, I must point out several problems with the majority's application of past precedent to the case at hand. Underlying *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), is the central due process concern that no defendant be convicted through the knowing use of perjured testimony by the prosecution.[1] At issue in *Giglio* was the prosecutor's failure to correct the false testimony of a crucial Government witness that there had been no promises made to him in connection with his testimony. The witness's perjury and the prosecutor's failure to correct the testimony concealed from the jury a possible motive for falsification of said testimony. In this case Johnson had no such motive for falsification.[2] Absent such a motive, usually resulting from promises made by the Government, and absent perjured testimony, *Napue, Giglio,* and cases in their wake impose no affirmative duty upon the prosecutor to clear up whatever confusion resulted from

---

for questioning Johnson's critical testimony does not mitigate, and may magnify, the importance of her uncorrected lie about her sentencing status. *See Napue v. Illinois*, 360 U.S. 264, 270, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). In any event, there is as much reason as not to believe that Johnson's perjury foreclosed a line of cross-examination which could have had a determinative impact on the jury's decision.

1. The majority opinion only rarely characterizes Johnson's testimony as perjurious, asserting instead that no distinction is drawn between such testimony and that which is merely misleading. Majority Op. at 805 n.19. This rule of law announced by the majority is not supported by the cases cited and is strongly contradicted by the actions of other courts. *See, e. g., United States v. Antone*, 603 F.2d 566 (5th Cir. 1979); *United States v. Brown*, 562 F.2d 1144, 1150 n.4 (9th Cir. 1977); *United States v. Lasky*, 548 F.2d 835 (9th Cir.), *cert. denied*, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977); *cf. United States v. Anderson*, 509 F.2d 312 (D.C. Cir.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975). Furthermore, the defendant makes no claim that Johnson perjured herself, pointing out only that she "was unsure of the status of her sentencing." Brief for Appellant at 34.

2. "She [Johnson] has received no further promises from the Government." Statement of D. Krakoff, Asst. U.S. Attorney, Transcript 4, *United States v. Iverson*, Crim.No. 78–587 (D.D.C. Nov. 27, 1978). This fact is uncontested. Furthermore, nothing in the record of Johnson's two sentencing proceedings even whispers of the existence of a deal with the prosecution or even of the knowledge of the sentencing judge that Johnson was testifying in a related case. Record, *United States v. Johnson*, Crim.No. 78–457 (D.D.C.). In fact, Johnson was to be sentenced on October 27, 1978, a month before the trial of Iverson. Johnson's sentencing was deferred *only* at the suggestion of the sentencing judge who wished to give Johnson a chance to prove that she deserved probation—by finishing her training course, getting a job, and staying off drugs. Transcript of Sentencing Hearing at 7, *United States v. Johnson*, Crim.No. 78–457 (D.D.C. Oct. 27, 1978). From this record, moreover, it is clear that Johnson may reasonably have believed, on the basis of these comments by the sentencing judge, that if she followed his suggestions she would receive probation.

To place the burden upon prosecutors, as the majority would do in this case, to correct testimony which an appellate court, examining a cold record, might view as "misleading," absent a motive for falsification by the witness, is an unwarranted extension of due process principles and a gross infringement upon the fundamental nature of our adversary system.

Johnson's testimony.[3] *Cf. Mastrian v. McManus,* 554 F.2d 813, 823 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977) (*Giglio* and *Napue* do *not* support the proposition "that a crucial witness's expectation of leniency must be revealed absent evidence of an express or implied promise.").[4]

The majority holds, however, that *Giglio* applies to the case at hand.[5] The standard of materiality therein relevant, whether the false testimony could in any reasonable likelihood have affected the judgment of the jury, is closely related to the standard for determining whether constitutional error can be held harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Barham,* 595 F.2d 231, 242 (5th Cir. 1979). Under either standard any error here must be held harmless beyond a reasonable doubt.

The majority opinion fails to analyze in a coherent fashion the evidence presented in this case. Defendant Iverson made a full confession of her criminal activity. This confession, voluntarily given and adequately corroborated, serves to support her conviction. Instead of analyzing the totality of the evidence in this case, *including* this confession, the majority merely relies upon the general rule of law that only *corroborated* confessions may support a conviction. Certainly confessions must be adequately corroborated to support a conviction. *Smith v. United States,* 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954); *United States v. Johnson,* 589 F.2d 716 (D.C.Cir.1978). The independent evidence necessary to corroborate a confession, however, need not serve as substitute evidence on each point but need only "support[ ] the trustworthiness of the admissions." *United States v. Johnson,* 589 F.2d at 718. *Accord, United States v. Kampiles,* 609 F.2d 1233, 1236 (7th Cir. 1979), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980); *United States v. Seckler,* 431 F.2d 642 (5th Cir. 1970); *United States v. DeGeorgia,* 420 F.2d 889 (9th Cir. 1969); *United States v. White,* 223 F.2d 674, 675 (2d Cir.), *cert. denied,* 350 U.S. 888, 76 S.Ct. 143, 100 L.Ed. 782 (1955). As the court stated in *United States v. Abigando,* 439 F.2d 827 (5th Cir. 1971),

> [r]equiring corroboration of a confession does not mean that the Government must introduce independent evidence on every element of the crime. Requiring independent proof of every element would go beyond the purpose of the rule which is intended to establish the reliability of confessions ... Some elements can be proved by the confession alone.

*Id.* at 832–33.

Even apart from the testimony of Susan Johnson, the independent evidence provided by the testimony of the bank teller adequately corroborated defendant's confession. The teller testified that the defendant called her to inquire whether she would cash a check for her "cousin." The defendant confessed to this conversation although stating that she called Johnson a "friend." The bank teller then narrated the encounter in the bank and the cashing of the check in much more detail than defendant had done

---

**3.** *United States v. Leonard,* 494 F.2d 955 (D.C. Cir.1974), relied upon by the majority, is not to the contrary. There the trial court had limited the scope of defendants' cross-examination on *the pertinent issue of the Government witness's* credibility. Here defendant was given complete freedom to impeach Johnson's testimony and she took full advantage of it. Transcript 102–43, *United States v. Iverson,* Crim.No. 78–587 (D.D.C. Nov. 27, 1978).

**4.** The majority opinion further fails to offer any guidance as to when the prosecutor's "affirmative duty" crystallizes. In this case, for example, the best way for the prosecutor to comply with the majority's suggestion would have been for him to correct Johnson's misstatement of her sentencing status as soon as it was uttered, thereby eliminating immediately any false impression presented to the jury. Such an interruption of cross-examination would seem, however, to infringe upon a defendant's right to conduct effective impeachment of Government witnesses.

The immunological safeguards proposed by the majority appear akin to a molecular overreaction to the relatively harmless infection in the case at hand. *Cf.* L. Thomas, *Germs,* in Lives of a Cell 88–94 (Bantam ed. 1974).

**5.** *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), cited by the majority, merely reiterates the standards set forth in *Giglio.*

in her confession.[6] This independent evidence adequately corroborated the defendant's confession so as to render it valid evidence lawfully supporting her conviction. *United States v. Micieli*, 594 F.2d 102, 109 (5th Cir. 1979); *United States v. Baty*, 486 F.2d 240 (5th Cir. 1973) ("knowledge" element established by confession alone); *Harrison v. United States*, 281 A.2d 222 (D.C. 1971) (same); *Sansone v. United States*, 334 F.2d 287, 293 (8th Cir. 1964), *aff'd*, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965) (same); *United States v. Mellon*, 165 F.2d 80 (2d Cir. 1947), *cert. denied*, 333 U.S. 873, 68 S.Ct. 902, 92 L.Ed. 1150 (1948) (forgery conviction).

Also supporting the defendant's conviction was the testimony of Susan Johnson. The majority simply and summarily concludes that a reasonable likelihood exists that the misleading impression that Johnson had already been sentenced affected the judgment of the jury. Even focusing solely upon Johnson's testimony, however, the majority refuses to recognize the insignificance of whatever misleading impression was left with the jury in view of the extensive impeachment of Johnson undertaken by defense counsel. Transcript 102–43, *United States v. Iverson*, Crim.No. 78–587 (D.D.C. Nov. 27, 1978). Although this impeachment cannot be set out here in full, the cross-examination that includes the testimony upon which the majority seizes to reverse these convictions must be examined in context, as must the capitalization in closing argument by defense counsel upon the testimony at issue.

Q. Now in regard to the—your pleading guilty in this case, you said that no promises had [ ] been made to you, is that correct?

A. Yes.

Q. You pled guilty, did you not, to one count of something, or other?

A. Yes.

Q. Just one single count. And do you know what the maximum penalty on that one particular count is?

A. Yes.

Q. And what is that?

A. Three years.

Q. And did you ever have occasion to ascertain as to whether any more serious offenses could be brought against you in regard to this particular check?

A. I don't understand.

Q. Well, did anybody ever talk to you about that you could be charged with forgery, or uttering of the check?

A. I was charged with uttering, forgery, theft of the mail.

Q. But you were . . .

A. I believe I had three counts of uttering.

Q. But you pleaded guilty to only one count, is that correct?

A. Yes.

Q. What is your understanding as to what is going to happen to the other counts?

A. I don't understand what you're saying.

Q. You indicated that you had been charged with a number of different counts?

A. Yes.

Q. Forgery, uttering, possession of stolen mail matter?

A. Yes.

Q. But that you pleaded guilty to one count?

A. Yes.

Q. What is going to happen to—or what became of the other counts that could have, or were brought against you—could have been, or were brought against you?

---

**6.** The only major discrepancy between the defendant's confession and the teller's narrative of the encounter is the latter's insistent denial that she received any payment in return for her cashing the check. This court is not in the position, however, of judging credibility. Rather, we are to judge only the adequacy of the independent evidence corroborating the defendant's confession. One such discrepancy does not dilute the force of the teller's testimony as corroborating proof. *See Scarbeck v. United States*, 317 F.2d 546, 567 (D.C.Cir.1962), *cert. denied*, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963).

A. They were dropped on the grounds that I would take a plea, understanding that I waived my rights to a trial by judge, or by jury, and because I already admitted to do, you know, to those counts, my attorney, you know, he—I don't know he ...

Q. So do I then characterize ...

Mr. Krakoff: Your Honor, I'm sorry, I don't believe the witness finished.

Mr. Wilhite: I'm sorry, please continue on.

The Witness: My attorney discussed the possibilities with me and told me that he could, that you know, that there were no promises, or that, you know, nothing like that, that they would be dropped completely. I mean, I understood exactly what I was doing, and ...

Mr. Wilhite: You ...

The Witness: ... and I pleaded guilty because I felt as though I was guilty.

Mr. Wilhite: Did some of the charges that were dropped ...

The Court: Mr. Wilhite, she's explained. I think the jury understand[s] it. She copped the plea to one count of a multi-count indictment and they dismissed the other counts—(addressing the witness) Or you understand that they were not going to prosecute any more than that one count, isn't that correct?

The Witness: Yes.

By Mr. Wilhite.

Q. You were—you haven't been sentenced in that case, have you?

A. Yes, I have.

Q. When were you sentenced?

A. The 28th.

Q. Of October?

A. Yes.

Q. What sentence did you receive?

A. I received three months' supervision. After three months, I have to go back in front of the Judge that sentenced me. It was Judge Gesell. If I went by the requirements of the court, that I could have my probation transferred to Michigan.

Q. And that occurred on October 28th, or thereabouts?

A. It was the day after—I don't remember the exact date, no.

Q. Was there a time that your sentence was continued until January of next year?

A. Pardon?

Q. Was there a time when your sentence was continued until January of next year?

A. January 15th, that would be the three months.

Q. So that the entire sentence was deferred until January 15th of next year? You haven't been sentenced yet, have you, or you're just not certain?

A. I have a probation officer. I have a counselor and I have to abide by certain, you know, regulations to the court. So I mean, I had assumed that—I mean, the way that my attorney explained it to me because we had discussed the possibility of—if I got probation, if you know, I could go home and ...

Q. So it's your assumption?

A. ... and he told me that after this period of time, I have to go back in front of him.

Q. Was there any discussion with either your attorney or the prosecutor that if you cooperated, or assisted the government, that that fact would be brought to the just's [sic] attention?

A. Yes, as a matter of fact, there was and Michael Lehr [U.S. Attorney] refused.

\* \* \* \* \* \*

[Closing Argument]

You heard—well, she didn't seem to be particularly certain whether she had been sentenced or not yet, but she has to go back to Court again and it just may happen in this particular circumstance that her own interests and the government's interest coincide, that is, that it is in both of their interests that she slough off some of the responsibility of this to one or as many people as she can.

Consider that we are not just talking about whether a crime was committed,

but how responsible a person was for the commission of a crime and how the Court would look upon the whole situation. Transcript 124–28, *United States v. Iverson*, Crim.No. 78–587 (D.D.C. Nov. 27, 1978); *id.* at 23–24 (Nov. 29, 1978).

It would appear from an examination of the record as a whole, therefore, that defense counsel was aware that Johnson's sentencing had been deferred until the January after the trial. He apparently made a tactical decision not to press the cross-examination of Johnson on this point, however, after discovering that the United States Attorney had refused to bring the fact of Johnson's testimony to the attention of the sentencing judge. Furthermore, defense counsel made use of Johnson's confusion over whether she had in fact been sentenced in his closing argument as set out above. Even had a perfectly clear impression of Johnson's sentencing status been left with the jury, moreover, such an impression would have added minimal impeachment weight in light of the absence of any promise, express or implied, made by the Government, in light of the extensive impeachment undertaken by the defendant, and in light of the substantial weight of the evidence incriminating the defendant. *See, e. g., Reddy v. Jones*, 572 F.2d 979 (4th Cir. 1977), *cert. denied*, 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978).

This trial was not perfect. The Constitution does not, however, guarantee criminal defendants perfect trials, only fair trials. Defendant Iverson had a fair trial. The jury was presented with substantial, if not overwhelming, evidence of appellant's guilt. Any error was harmless beyond a reasonable doubt. I would affirm these convictions.